MUENCH, Appellant, vs. PUBLIC SERVICE COMMISSION, Defendant: NAMEKAGON HYDRO COMPANY, Respondent: THE STATE, Appellant.*

*April 9—May 6, 1952.*
*September 18—October 7, 1952.*

* Motion for rehearing granted. See opinion on rehearing, post, p. 515c.

Hold

W.

*A. D. Sutherland* of Fond du Lac, for the appellant V. J. Muench.

For the appellant state of Wisconsin there was a brief by the *Attorney General* and *Roy G. Tulane,* assistant attorney general, and oral argument by *Mr. Tulane.*

For the respondent there was a brief by *Glen H. Bell* and *Charles P. Seibold,* both of Madison, and *Douglas & Omernik* of Spooner, and oral argument by *Mr. Bell, Mr. Seibold,* and *Mr. E. E. Omernik.*

CURRIE, J. We are concerned in this case with the problem of the nature of public rights in the navigable streams of the state and the beds underlying the same, and the protection of such rights. A review of the historical background and a sketching of the development of the recognition of these public rights in the court decisions and statutes of this state should prove to be helpful in passing upon the specific issues presented by the appeals therein.

After the Revolutionary War, the original thirteen states were impoverished and were confronted with the problem of paying the debts created by the war. States without western lands demanded that Virginia, and other states claiming such lands to the west, should cede the same to the Confederation to be sold to pay such debts. In 1783 the Virginia legislature authorized the ceding of the Northwest Territory to the Confederation, and the actual deed of conveyance was executed March 1, 1784. This cession was made upon two conditions: (1) The new states to be admitted as members of the Federal Union were to have the same rights to sovereignty as the original states; and (2) the navigable waters flowing into the Mississippi and the St. Lawrence rivers, and the carrying places between them, were to be forever free public highways. These conditions were incorporated into the Northwest Ordinance of 1787, which set up the machinery for the government of the Northwest Territory.

Sec. 1, art. IX of the Wisconsin constitution, adopted by the territorial convention on February 17, 1848, and approved by the act of congress admitting Wisconsin into the Union, incorporated verbatim the wording of the Northwest Ordinance with respect to navigable waters, such section reading as follows:

"The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other

state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost, or duty therefor."

The late Adolph Kanneberg wrote an excellent article entitled "Wisconsin Law of Waters," which appeared in the 1946 Wisconsin Law Review, 345, 349. Mr. Kanneberg was a lawyer who specialized in the field of waters and watercourses and was a recognized authority on the subject not only in Wisconsin, but in the nation. He also served as a member of the Railroad Commission of this state for eight years. In his article Mr. Kanneberg stated:

"The Ordinance of 1787 does not define the term 'navigable water.' There was no rule of the federal government for the guidance of the states with respect to that matter. The ordinance merely provided that navigable waters were to be public highways, and thus states like Wisconsin and Oregon, which had vast forests of pine timber which would float, found it to their interests to adopt the saw-log test of navigability, while other states adopted different tests of navigability. The Atlantic states generally adopted the salt-water test of navigability, that is to say, any stream up to the point to which the tide ebbs and flows is navigable. In North Carolina, for example, the Yadkin river which has a width of one hundred seventy-five yards is nonnavigable, whereas in Wisconsin any stream capable of floating a saw log during one or two weeks of the spring or other freshets is navigable."

One of the early cases which established the "saw-log" test of navigability in the state is that of *Olson v. Merrill* (1877), 42 Wis. 203, 212. In that case a dam had been built on Levis creek, a small stream in Jackson county, without legislative authority. An action was brought to abate the dam and for damages. Only in certain seasons of the

year was there sufficient water to permit the running of logs. In order to run logs, fallen trees and "alder towheads" had to be cleared out, and because the stream was very crooked it was necessary to station men along the bank with pikes to keep the logs moving. The court in holding the stream to be navigable made this statement:

"And we deem it essential to the public interest in the pine-growing regions of the state, spoken of in *Whisler v. Wilkinson,* to adopt the rule collected from the authorities in Angell on Watercourses, sec. 537, and substantially adopted in the charge of the court below: 'Nor is it essential to the public easement that the capacity of the stream, as above defined, should be continuous; or, in other words, that its ordinary state, at all seasons of the year, should be such as to make it navigable. If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes, and recurring as regularly as the seasons, and if its periods of high water or navigable capacity ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement.' "

It will thus be seen that Wisconsin, in adopting the sawlog test of navigability, based the same on commercial considerations. Before proceeding to examine some of the later cases and statutes to see whether the same test of navigability still prevails, or whether recreational use of water as well as commercial use may also determine navigability, we turn now to the question of the ownership of the lands underlying our streams.

The United States supreme court in *Barney v. Keokuk* (1876), 94 U. S. 324, 24 L. Ed. 224, declared that the individual states have the right to determine for themselves the ownership of land under navigable waters. At an early date in its history the Wisconsin court put itself on record as favoring the trust doctrine, that the state holds the beds underlying navigable waters in trust for all of its citizens, subject only to the qualification that a riparian owner on the

bank of a navigable stream has a qualified title in the stream bed to the center thereof. See the discussion of this subject in *McLennan v. Prentice* (1893), 85 Wis. 427, 443–445, 55 N. W. 764.

One of the clearest statements of the trust doctrine is found in *Illinois Steel Co. v. Bilot* (1901), 109 Wis. 418, 426, 84 N. W. 855, 85 N. W. 402, as follows:

"The United States never had title, in the Northwest Territory out of which this state was carved, to the beds of lakes, ponds, and navigable rivers, except in trust for public purposes; and its trust in that regard was transferred to the state, and must there continue forever, so far as necessary to the enjoyment thereof by the people of this commonwealth. Whatever concession the state may make without violating the essentials of the trust, it has been held, can properly be made to riparian proprietors."

In the case of *Franzini v. Layland* (1903), 120 Wis. 72, 81, 97 N. W. 499, the court stated:

"This state, by judicial authority so long acquiesced in as to become a rule of property, quite early established as its policy the doctrine that the title to a riparian proprietor upon a navigable stream goes not by force of his patent, whether received from the government or from the state, but by the mere favor or concession of the state to the center of the stream, subject to all those public rights which were intended to be preserved for the enjoyment of the whole people by vesting the title to the beds of such streams in it in trust for their use."

Counsel for the company in their brief call attention to a statement made by this court in *Angelo v. Railroad Comm.* (1928), 194 Wis. 543, 554, 217 N. W. 570, which they contend repudiates the doctrine that the trust extends to the lands underlying a navigable stream, and argue that the title of a riparian owner to the land from high-water mark to the center of the stream is not qualified by a public trust but is absolute. The statement so relied upon in the *Angelo Case* reads:

". . . yet it is to the bed of water as a means of navigation and as a public highway that the state has assumed the trust, and not to the land under the same as land, for as time goes on the course of the stream may be changed or the body of water disappear, but the land formerly so covered and the title thereto remains."

We construe the above-quoted statement from the *Angelo Case* as merely holding that the trust extends only to land under the stream of the navigable water so long as such land constitutes part of the bed of the stream, and if the course of the stream is changed so that such land no longer is part of the river bed, it ceases to be impressed with the public trust.

In the light of this background we next turn our attention to the recognition given by court decisions and statutes to public rights in navigable streams apart from navigation for commercial purposes such as the floating of saw logs.

In the case of *Willow River Club v. Wade* (1898), 100 Wis. 86, 76 N. W. 273, 42 L. R. A. 305, the plaintiff club, a Minnesota corporation, owned two hundred acres of land along both sides of Willow river, a nonmeandered stream passing through St. Croix county and emptying into the St. Croix river at Hudson, which stream met the saw-log test of navigability. The defendant entered upon the stream in a rowboat from a public highway touching the stream and from such boat at a point in the stream where the plaintiff owned land on both sides caught ten trout, and the action was one to recover $20 damages for the taking of these trout. This court held that although the plaintiff had title to the bed of the stream, nevertheless, it held the same in trust for the use of the public and declared (p. 103) :

"Since the defendant kept within the banks of the river,— within the limits of the public highway,—his fishing was nothing more than the exercise of a right common to the public. We must hold that the Willow river was a public navigable stream, and the defendant was not guilty of trespass by going upon it, as he did, catching the fish in question."

In *Diana Shooting Club v. Husting* (1914), 156 Wis. 261, 271, 145 N. W. 816, the plaintiff incorporated club had a valid subsisting lease of certain lands abutting on Rock river in Dodge county, including Malzahn's bay at the point of the alleged trespass by the defendant, which purported to give the plaintiff exclusive hunting privileges upon such lands. On September 24, 1911, without trespassing upon the lands of the plaintiff, the defendant Paul O. Husting (later United States senator from Wisconsin) entered his hunting boat floating upon the waters of Rock river, and with the aid of a pole and paddle propelled it down the river to the place of the alleged trespass for the purpose of shooting wild ducks, and pushed it into a growth of vegetation known as "flag" which grew from the bottom of the water to a height of from four to five feet above the surface. At such time and place the water below defendant's boat was about twelve inches deep and his boat was floating upon the water. For at least thirty-five years prior to the date of the alleged trespass, Rock river, including Malzahn's bay, was a natural navigable body of water which had been navigated by the public generally by skiffs and rowboats. This case is significant in that the navigability was established not through any commercial use, such as floating of logs, but through the use of shallow draft boats for purposes of recreation. This court held that no trespass had been committed by the defendant, and stated (p. 271):

"Navigable waters are public waters and as such they should inure to the benefit of the public. They should be free to all for commerce, for travel, for recreation, and also for hunting and fishing, which are now mainly certain forms of recreation. Only by so construing the provisions of our organic laws can the people reap the full benefit of the grant secured to them therein. This grant was made to them before the state had any title to convey to private parties, and it became a trustee of the people charged with the faithful execution of the trust created for their benefit. Riparian owners,

therefore, took title to lands under navigable waters with notice of such trust and subject to the burdens created by it. It was intended that navigable waters should be public navigable waters, and only by giving members of the public equal rights thereon so far as navigation and its incidents are concerned can they be said to be truly public.

"Hunting on navigable waters is lawful when it is confined strictly to such waters while they are in a navigable stage, and between the boundaries of ordinary high-water marks. When so confined it is immaterial what the character of the stream or water is. It may be deep or shallow, clear or covered with aquatic vegetation."

The Michigan supreme court in *Collins v. Gerhardt* (1926), 237 Mich. 38, 211 N. W. 115, held that a trout fisherman who waded a river, angling as he went, was not guilty of trespass on the lands of plaintiff who was a riparian owner owning the land on the banks and to the center of the stream. Michigan also applies the saw-log test of navigability and the particular stream involved was held to meet such test. This Michigan decision is in accord with the concurring opinion of Mr. Justice MARSHALL in *Willow River Club v. Wade, supra,* wherein he declared (p. 104):

"In my judgment the right of fishing in navigable waters is common to all, and exercisable, so far as it can be done without trespass on the banks thereof, whether the person exercising such right be at the time navigating the stream in a boat or otherwise floating upon the surface of the water, or traveling upon the bed in the shallows, or anywhere in any manner, between the lines of ordinary high-water mark."

In 1911 Wisconsin enacted the first Water Power Act (ch. 652, Laws of 1911), which contained a new definition of navigable streams and rivers which was very similar in wording to our present sec. 30.01 (2), Stats., which reads:

"All rivers and streams which have been meandered and returned as navigable by the surveyors employed by the government of the United States, and all rivers, streams, sloughs, bayous, and marsh outlets, whether meandered or nonme-

andered *which are navigable in fact for any purpose whatsoever* are hereby declared navigable to the extent that no dam, bridge, or other obstruction shall be made in or over the same without the permission of the legislature."

Therefore, since 1911 it is no longer necessary in determining navigability of streams to establish a past history of floating of logs, or other use of commercial transportation, because any stream is *"navigable in fact"* which is capable of floating any boat, skiff, or canoe, of the shallowest draft used for recreational purposes. Thus, Mr. Kanneberg, in his article hereinbefore mentioned, stated (1946 Wisconsin Law Review, 347):

"Thus in Wisconsin when it is said that a water is navigable, it is merely a different way of saying that it is public—public not only for navigation, but for hunting, fishing, recreation, and for any other lawful purpose."

The Minnesota court nearly sixty years ago in *Lamprey v. State* (1893), 52 Minn. 181, 199, 53 N. W. 1139, declared:

"But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. Certainly, we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit."

Our present Water Power Law dates from 1915 (ch. 380, Laws of 1915) and such act contained a provision (sec. 1596–7, Stats. 1915) which required the Railroad Commission (predecessor to the Public Service Commission), in granting a permit to construct a dam upon a navigable stream, to find that "the proposed dam will not materially obstruct existing navigation *or violate other public rights."* This same provision is now contained in sec. 31.06 (3), Stats.

The nature of *"these other public rights"* referred to in sec. 31.06 (3), Stats., is elucidated in the opinion of this court in *Nekoosa-Edwards Paper Co. v. Railroad Comm.* (1930), 201 Wis. 40, 46, 228 N. W. 144, 229 N. W. 631. That case involved a review of an order of the Railroad Commission denying the plaintiff company a permit or license to maintain a dam on Four Mile creek, a stream flowing into the Wisconsin river. Application for the permit was made under secs. 31.31 to 31.33 (the Milldam Act), which applies to streams "not navigable for any purpose." The license was denied for the reason that the commission found that the stream was navigable and that such a dam must be authorized pursuant to secs. 31.05 to 31.09. Mr. Justice CROWNHART, speaking for the court, declared (p. 46) :

"Indeed, courts have recognized, and now more than ever before recognize, the public's interest in pleasure and sports as a measure of public health. *State ex rel. Hammann v. Levitan,* 200 Wis. 271, 228 N. W. 140. In fact, navigable waters, in contrast with nonnavigable waters, is but one way of expressing the idea of public waters, in contrast with private waters. Boating for pleasure is considered navigation as well as boating for pecuniary profit. *State v. Korrer,* 127 Minn. 60, 148 N. W. 617, 1095; L. R. A. 1916 C, p. 139.

"Many of the meandered lakes and streams of this state, navigable in law, have ceased to be navigable for pecuniary gain. They are still navigable in law, that is, subject to the use of the public for all the incidents of navigable waters. As population increases, these waters are used by the people for *sailing, rowing, canoeing, bathing, fishing, hunting, skating, and other public purposes.* While the public right may have originated in the older use or capacity of the waters for navigation, such public right having once accrued, it is not lost by the failure of pecuniary profitable navigation, but resort may be had thereto for any other public purpose. Our state has for many years been extensively engaged in the propagation of fish and the stocking of the waters of the state with fish fry in order that the public may more fully enjoy the sport and recreation of fishing. By reason of the

state's enterprise in behalf of the public, the small streams of the state are fishing streams to which the public have a right to resort so long as they do not trespass on the private property along the banks."

The foregoing quotation from the opinion in *Nekoosa-Edwards Paper Co. v. Railroad Comm., supra,* seems to imply that there first must have been navigation for pecuniary gain in order to make a stream navigable so as to give rise to public rights for recreation therein. However, as we have previously explained herein, we do not deem the test of navigability under the definition contained in sec. 30.01, Stats., to require proof of prior navigable use for pecuniary gain as a condition precedent to a finding of navigability.

The 1929 legislature enacted ch. 523, Laws of 1929, which amended sec. 31.06 (3), Stats., so as to provide that *the enjoyment of scenic beauty is a public right* to be considered by the Public Service Commission in making findings as to whether a permit for a proposed dam shall be issued. Thus we have a further public right in navigable streams recognized by legislative enactment which is highly illustrative of the trend to extend and protect the rights of the public to the recreational enjoyment of the navigable waters of the state.

Pursuant to this last-mentioned amendment to sec. 31.06, Stats., the Public Service Commission (Docket 2—WP—326) denied an application of the Mellen Granite Company for a permit to construct a dam across the Potato river in Iron county for the reason that waterfalls and cataracts for about one mile of river in a scenic gorge would be forever destroyed.

We now come to the specific issues presented on this appeal. We have gone to considerable length in tracing the historical development in Wisconsin of the recognition of public rights in our navigable streams, other than the right

of commercial navigation, because we believe the same to be highly pertinent in passing upon the specific questions raised herein.

The first of these questions is whether there is any right of review under ch. 227, Stats. (the Uniform Administrative Procedure Act), of the findings of the Public Service Commission made pursuant to secs. 31.06 (3), and 31.08, Stats., as a condition precedent to the issuing of a permit for the construction of a dam in a navigable stream.

Sec. 31.08, Stats., provides as follows:

"Upon receipt of an application under section 31.07 procedure shall be had substantially as required by section 31.06, and if the commission shall find that such operation and maintenance does not materially obstruct existing navigation or violate other public rights and will not endanger life, health, or property, a permit is hereby granted to the applicant."

The company contends that the permit for a dam provided in sec. 31.08, Stats., is in the nature of a *"legislative grant"* and has the same effect as if the legislature itself had by special act authorized the construction of the dam, as was the legislative practice before the enactment of the first Water Power Act in 1911. The trial court in its memorandum opinion upheld the company in this contention.

There are three sections of the statutes which must be considered in determining whether the findings of the commission in the instant case are subject to review under ch. 227, Stats., such sections being 31.28, 196.41, and 227.15.

Sec. 31.28, Stats., provides:

"Orders of the commission shall be subject to review in the manner provided in ch. 227."

Sec. 196.41, Stats., provides:

"Any order or determination of the commission may be reviewed in the manner provided in ch. 227."

Sec. 227.15, Stats., provides:

"Administrative decisions, which directly affect the legal rights, duties, or privileges of any person, whether. affirmative or negative in form, except the decisions of the department of taxation, the commissioner of banks, and the commissioner of savings and loan associations, shall be subject to judicial review as provided in this chapter; but if specific statutory provisions require a petition for rehearing as a condition precedent, review shall be afforded only after such petition is filed and determined."

Prior to the adoption of the Uniform Administrative Procedure Act by the legislature in 1943, sec. 31.28, Stats. 1941, read:

"The state or any party to a proceeding authorized by this chapter to be had before the commission may have a review in the circuit court for Dane county of any order, finding, or determination made therein by the commission, . . ."

The company concedes that under the foregoing wording of sec. 31.28, Stats., as it existed before it was amended by ch. 375, Laws of 1943, which created the Uniform Administrative Procedure Act, there would have been a right of review of the findings of the commission in the instant case in the circuit court for Dane county; but contends that because only *"orders"* of the commission are referred to in present sec. 31.28, such findings are no longer so reviewable.

The Uniform Administrative Procedure Act (present ch. 227, Stats.) was drafted by the committee on administrative tribunals of the State Bar Association of which Mr. Ralph M. Hoyt was chairman, and the association sponsored such act. After adoption of the act, Mr. Hoyt contributed an article which was published in the 1944 Wisconsin Law Review, 214, explaining the act and the objectives sought to be accomplished thereby. A reading of the entire article clearly establishes that the sole purpose of the legislature in adopting the act was to establish a uniform method of review

and there was no intent to abolish any existing right of review. In his article Mr. Hoyt stated (p. 229):

"Each of the seventy-odd separate statutes prescribing methods of review was specifically changed over into a mere reference to the new act, the usual form of language being: 'Any order of the board shall be subject to review in the manner provided in chapter 227.' "

The foregoing explains the change in wording of sec. 31.28, Stats., hereinbefore mentioned. Sec. 227.20 permits a review of the findings of an administrative board or commission as an incident of the review of an administrative decision granted by sec. 227.15. Ordinarily such decisions take the form of an order and that undoubtedly accounts for the present wording of sec. 31.28, and such wording was not intended as a limitation on the right of review granted by sec. 227.15.

It is our conclusion that secs. 31.28, 196.41, and 227.15, Stats., must all be construed together, keeping in mind that there was no legislative intent in enacting the Uniform Administrative Procedure Act of 1943 to abolish any existing circuit court right of review. The findings of the commission in the instant case constitute a final decision or determination by the commission upon which a permit is to be issued to the plaintiff company. Therefore, such a decision is reviewable under sec. 227.15.

The second question to be passed upon is whether the petitioner Muench is a person *"aggrieved"* and *"directly affected,"* under the provisions of sec. 227.16 (1), Stats., by the decision of the commission in this instance which is reviewable under sec. 227.15. The company contends that Muench is not directly affected by the commission's decision because he has no direct pecuniary interest which would be jeopardized by the issuance of a permit to erect the dam. The right of the citizens of the state to enjoy our navigable streams for recreational purposes, including the enjoyment

of scenic beauty, is a legal right that is entitled to all the protection which is given financial rights.

Mr. Justice VINJE in his decision in *Diana Shooting Club v. Husting, supra,* stated (p. 271):

"The wisdom of the policy which, in the organic laws of our state, steadfastly and carefully preserved to the people the full and free use of public waters, cannot be questioned. Nor should it be limited or curtailed by narrow constructions. It should be interpreted in the broad and beneficent spirit that gave rise to it in order that the people may fully enjoy the intended benefits."

We believe the foregoing language of Mr. Justice VINJE is equally applicable to the construction which we should place upon sec. 31.06 (3), Stats., which gives legislative recognition to the rights of our citizens to enjoy the navigable waters of this state for recreational purposes, and that such rights should not be "limited or curtailed by narrow constructions." Such rights would be severely limited, curtailed, or endangered if we did not hold that any citizen who has appeared at a hearing of the Public Service Commission, held under sec. 31.06 with respect to an application to erect a dam in a navigable stream, is *"aggrieved"* and *"directly affected"* by a decision of the commission finding that public rights will not be violated by erection of a proposed dam so as to entitle him to petition for review under sec. 227.15. We conclude that petitioner Muench was therefore entitled to petition the circuit court for review.

Our holding in this respect is in keeping with the trend manifested in the development of the law of navigable waters in this state to extend the rights of the general public to the recreational use of the waters of this state, and to protect the public in the enjoyment of such rights.

The third question to be passed upon is whether it was error for the trial court to deny the petition made by the attorney general, in the name of the state, to intervene in the review proceedings.

Sec. 227.16 (1), Stats., provides, "the court, in its discretion, may permit other interested persons to intervene." In fairness to the trial court it should be stated that the state's petition for intervention was not denied on the basis of an exercise of the discretion so granted to the court by sec. 227.16 (1), but rather on the ground that there were no valid pending proceedings for review in which the state could intervene. When public rights to the recreational enjoyment of the navigable waters of the state may be violated by the issuance of a permit to erect a dam, it is clearly the duty of the state to appear in behalf of the public in the proceedings pending before the Public Service Commission on the application for permit. In the instant case the state, through its Conservation Commission, did make such appearance before the Public Service Commission and did petition for rehearing, thus complying with the requirements of sec. 196.405 (2), and therefore was entitled to intervene in the proceedings for review in circuit court. It would have to be a highly unusual case in which it would not be an abuse of discretion for the trial court to deny the state the right to intervene in review proceedings where public rights are at stake.

Counsel for the company advances as an argument, in opposition to the state's application to intervene in the review proceedings, that such intervention was entirely unnecessary because it is the duty of the Public Service Commission, and not the attorney general, to represent the state in the proceedings upon the application of the company for a permit to erect a dam. The Public Service Commission in conducting hearings upon applications made under ch. 31, Stats., for the erection of a dam in a navigable stream, and making its findings on the issues presented, is acting in a judicial [1] capacity. In such a proceeding where the dam is one to

[1] This word is corrected to read "quasi-judicial." See opinion on rehearing, post, p. 515p. REPORTER.

produce electric power, as in the instant case, there are usually conflicting interests represented. On the one side is the applicant, together with those persons and interests who will benefit from the power to be generated as a result of the construction of the dam, and who therefore favor granting the application; while on the other side are those citizens and organizations which are interested from the standpoint of the public use of the stream for recreational purposes and oppose the application for permit on the ground that such public rights will be endangered or destroyed if the dam be constructed. To hold that the Public Service Commission should not only decide between these conflicting interests in its judicial capacity, but also should represent the state in protecting public rights, would make the commission both judge and advocate at the same time. Such a concept violates our sense of fair play and due process which we believe administrative agencies acting in a quasi-judicial capacity should ever observe.

The fourth and last question which confronts us is the constitutionality of the so-called *"county board law"* which was enacted in 1947, and constitutes the last portion of sec. 31.06 (3), Stats., reading as follows:

". . . but in case of a dam or flowage located outside the boundaries of a state park or state forest no permit shall be denied on the ground that the construction of such proposed dam will violate the public right to the enjoyment of fishing, hunting, or natural scenic beauty if the county board or boards of the county or counties in which the proposed dam and the flowage created thereby are located by a *two-thirds* vote approve the construction of such dam."

We are called upon to pass on the constitutionality of this enactment, although the case is here on questions of procedure rather than on the merits, because the Public Service Commission made no finding as to whether the proposed dam would violate public rights to the enjoyment of fishing, hunting, and scenic beauty. Therefore, the constitutionality of

the "county board law" will determine whether the judgment should be reversed with directions to the circuit court to remand the matter to the commission for the making of additional findings as to whether the public rights of fishing, hunting, and scenic beauty will be violated by the proposed dam, which would be necessary if such enactment is unconstitutional; or whether the cause should be merely remanded to the circuit court for review upon the present findings of the commission, which would be proper if the "county board law" be constitutional.

Sec. 22, art. IV of the Wisconsin constitution provides:

"The legislature may confer upon the boards of supervisors of the several counties of the state such powers of a local, legislative and administrative character as they shall from time to time prescribe."

We interpret the foregoing section of the constitution to mean that the state may only delegate to county boards powers of a local character, and may not delegate powers over matters of state-wide concern.

In the case of *Monka v. State Conservation Comm.* (1930), 202 Wis. 39, 231 N. W. 273, this court had before it the constitutionality of two statutes enacted in the furtherance of conservation of fish and game for the general welfare and benefit of all the people, although relating to Lake Michigan only. It was contended that such two statutes were unconstitutional under sec. 18, art. IV, Const., providing:

"No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title."

The court held that bills on subjects of such general and state-wide concern as the furtherance of the conservation of fish and game were not merely *"local"* because in their execution they operated territorially upon a particular section of the state only. This decision would seem to be decisive on the issue of constitutionality presented in the instant case,

because interference with public rights of hunting, fishing, and scenic beauty by the erection of a dam on a navigable stream is of state-wide concern, even though the dam and the flowage created thereby are located in one or more particular counties.

The state of Kansas has a provision in its state constitution very similar in wording to sec. 22, art. IV of our Wisconsin constitution which authorized the Kansas legislature to delegate only matters of local character to county boards. In *State ex rel. Perkins v. Hardwick* (1936), 144 Kan. 3, 8, 57 Pac. (2d) 1231, the Kansas supreme court had before it the constitutionality of a statute authorizing the board of county commissioners of any county to devise methods and means to stop the drifting of soil in their respective counties. The Kansas court held that the statute was intended to prevent drifting as caused by wind and not by water and that the problem was one of state-wide concern and not of local character, and therefore the act was unconstitutional. In its decision the court stated:

"It does not seem to need much consideration of the matter to perceive that the situation was not of local character in any respect, but affected a wide area, not limited even to the state of Kansas. . . .

". . . In our judgment, the evil to be eradicated and the injury to be remedied come not from any local situation nor from any county situation, but from one that is almost state-wide and that cannot by any fiat of the legislature be limited in its scope. The attempted delegation of power to legislate violates the provisions of our constitution."

It is our considered judgment that the "county board law" contained in the last portion of sec. 31.06 (3), Stats., which provides that it shall be unnecessary for the Public Service Commission to make any findings as to whether a proposed dam would violate public rights to the enjoyment of fishing, hunting, or natural scenic beauty, if the county

board (or boards) of the county (or counties) where the dam and flowage are to be located, has approved the construction of the dam by a two-thirds vote, is unconstitutional. This requires that the case be remanded to the Public Service Commission to make findings on the question of the possible violation of such public rights by the construction of the proposed dam.

The state contends that the Namekagon river, on which the proposed dam is to be erected, is famous throughout the eastern half of the United States because of its scenic beauty, desirability for float trips and canoeing, and for a type of fishing water which the federal fishing and wildlife service has described as rapidly disappearing from the state of Wisconsin. The Public Service Commission will be required to make findings as to whether public rights for the recreational enjoyment of this stream in its present natural condition outweigh the benefits to the public which would result in the construction of the dam.

*By the Court.*—Judgment reversed with directions to remand the cause to the Public Service Commission for further proceedings in accordance with this opinion.

A motion for rehearing was granted on June 23, 1952, and oral argument was heard September 18, 1952.

*A. D. Sutherland* of Fond du Lac, for the appellant V. J. Muench.

For the appellant state of Wisconsin there was a brief by the *Attorney General* and *Roy G. Tulane,* assistant attorney general, and oral argument by *Mr. Tulane.*

For the respondents there was a brief by *Glen H. Bell* and *Charles P. Seibold,* both of Madison, and *Douglas & Omernik* of Spooner, and oral argument by *Mr. Bell, Mr. Seibold,* and *Mr. E. E. Omernik.*

There was also a brief by *Maloney & Wheeler* of Madison, as *amicus curiae.*

The following opinion was filed October 7, 1952.

CURRIE, J. (*on rehearing*). The court granted a rehearing in this case on the question of the constitutionality of that part of sec. 31.06 (3), Stats., quoted in the original opinion and referred to therein as the "county board law," and had the benefit of hearing further oral argument on this issue and have been favored with further excellent briefs on both sides of the issue.

The first problem which presents itself in determining the constitutionality of the statute in question is the proper construction of sec. 22, art. IV of the Wisconsin constitution, which provides:

"The legislature may confer upon the boards of supervisors of the several counties of the state such powers of a *local, legislative and administrative character* as they shall from time to time prescribe." (Emphasis supplied.)

Counsel for the company concede that the power attempted to be delegated to county boards by the "county board law" is legislative and not administrative.

Does the word *"local"* modify the words *"legislative . . . character,"* or does the word *"local"* present an additional category of power that may be delegated by the legislature to county boards? We think it is clear that the word *"local"* does modify *"legislative . . . character."* If it were to be held that *"local"* did not modify *"legislative"* there would be no limitation on the type of legislative power that might be delegated by the legislature to county boards, except as might be prohibited by other sections of the constitution. For example, under such construction, the legislature would be free to delegate such powers to county boards as that of regulating the transfer and descent of property, regulating domestic relations, or providing for elections of county or state officials. We do not believe that it was the intention of the framers of our constitution that any of the afore-mentioned

types of legislative power might be delegated to county boards, but that instead they intended the word *"local"* should be a limitation upon the type of legislative power which might be delegated.

Counsel for the respondent company maintain that if the word *"local"* be construed by the court as limiting the type of legislative power which may be delegated to county boards, then such word must be construed in its territorial sense so as to authorize any delegation of legislative power to county boards which operates within the boundaries of the county. On the other hand, it is the position of counsel for the petitioner, and of the attorney general, that the word *"local,"* properly construed, includes only those matters which primarily affect the people of a locality, and stands in opposition to matters of state-wide concern which affect all the people of the state.

There seems to be almost a complete dearth of authority on this particular point. Counsel for the company submit that there are two states, New York and Michigan, which have provisions in their constitutions reading substantially as does sec. 22 of art. IV of the Wisconsin constitution, and that they are more akin to our own provision than that of the Kansas constitution. Apparently, there are no decisions of the Michigan supreme court on the point at issue. The New York court of appeals held in *Smith v. Levinus* (1853), 8 N. Y. 472, 474, that the legislative delegation of power to county boards " 'to provide for . . . the protection of shell and other fish within the waters of their respective counties' " was a valid delegation of legislative power under the provision of their constitution corresponding to our sec. 22 of art. IV, and declared that (p. 475) :

". . . to make a law to regulate the fishing for oysters in Cow Bay, is to legislate for a locality. It is *local legislation*. It is of no consequence whether the people of the state

own the oysters in that locality or not. If they do, they have a right to preserve them." (Emphasis supplied.)

The grounds stated by the New York court in *Smith v. Levinus, supra,* for upholding the delegation of power there presented, tends to support the position advanced by the company in the instant case. However, the same conclusion might have been reached by finding that, while the protection of fish and other aquatic life was a subject of both state and local concern, the interests of the locality were paramount as of the time when that case was decided ninety-nine years ago.

Regardless of how the New York court may have interpreted its constitutional provision corresponding to our sec. 22, art. IV, this court, as early as 1875, in its decision in *Slinger v. Henneman* (1875), 38 Wis. 504, determined that our legislature had no power to delegate to county boards the right to legislate on all matters of state-wide concern, even though the attempted delegated power was to be exercised only within the boundaries of the county. In that case the court had before it a statute, sec. 8 of which created a right of action to recover damages for injuries caused by dogs, irrespective of whether the owner had prior notice of vicious tendencies; and sec. 9 thereof authorized a county board to exempt its county from the operation of sec. 8. The printed brief of the appellant contended that sec. 9 of the statute was in direct conflict with sec. 22, art. IV of the constitution. While the court does not mention such section of the constitution in its opinion, it did declare as follows (p. 510):

"Yet it is undoubtedly true that in matters purely local and municipal, the legislature may enact conditional laws, and refer it to the people or proper municipal authorities to decide whether such laws shall or shall not have force and effect in their respective municipalities. The cases which sustain this power are numerous. *The State v. O'Neill,* 24 Wis. 149, is one of these. In principle, the same power is exercised in the numerous laws enacted by the legislature

giving to municipalities the power to establish by-laws and ordinances in respect to municipal matters. Sec. 8, however, does not relate to municipal affairs, but it seeks to change a rule of the common law pertaining to a matter of general interest. As well might the legislature authorize the board of supervisors of a county to abolish in such county days of grace on commercial paper, or to suspend the operation of the statute of limitations. Such legislation is clearly within the restriction on the power of the legislature to delegate its authority, and is therefore inoperative and void."

After due consideration, it is our conclusion that the proper construction of the word *"local,"* as used in sec. 22, art. IV, Const., is that which we stated in the original opinion in this case as including only those matters which primarily affect the people of the locality, and stands in opposition to *"matters of state-wide concern"* which affect all the people of the state.

The brief *amicus curiae* filed herein urges that such construction of this constitutional provision, if allowed to stand, could "create a chaotic condition in connection with the powers of county boards historically long exercised and woven into the fabric of county government." The brief submitted by the respondent company, in support of its motion for rehearing, lists a large number of county activities authorized pursuant to statute, which activities involve some elements which are of state-wide concern. We believe that a further analysis of what is meant by a matter of state-wide concern, as opposed to one of local character, will allay at least some of the fears expressed by counsel.

As to some subjects of legislative action it is possible to say that they are exclusively of state-wide concern, while others may be fairly classified as entirely of local character, affecting only the interests of the people in a particular locality of the state. However, as to many subjects of legislative action it is not possible to fit them exclusively into one or the other of these two categories. The right to fish and hunt, or to enjoy scenic beauty, as an incident to the right to

navigate the navigable waters of this state (which is the subject of legislative action in the instant case) is an example of a type of legislation which affects the interests of the people of the entire state, as well as those of a particular county. If a particular county is permitted to take action which will lead to the impairment or the destruction of hunting, or fishing, or the right to enjoy scenic beauty on that part of a particular navigable stream lying within the limits of a county, the interests of the people of the entire state may be adversely affected thereby. It would therefore seem that the test which ought to be applied in determining the validity of delegation of legislative power in such a case is that of paramount interest.

As pointed out in our original opinion, Wisconsin's present Water Power Law dates from 1915, and such law required the Railroad Commission (predecessor to the Public Service Commission), in granting a permit to construct a dam upon a navigable stream, to find that "the proposed dam will not materially obstruct existing navigation *or violate other public rights.*" The rights to hunt and fish were certainly included within the term *"other public rights"* because they had been recognized as rights incidental to navigation in decisions of this court rendered prior to 1915. In 1929, the legislature amended the Water Power Law so as to provide that *"the enjoyment of natural scenic beauty is declared to be a public right."* This probably was no more than legislative recognition of a previously existing public right which had always existed. Therefore, from 1915 until the enactment of the "county board law" in 1947, or for a period of thirty-two years, the Public Service Commission was required by statute to consider the effect on such public rights as hunting, fishing, and enjoyment of scenic beauty which would result from the erection of a proposed dam for which a permit was sought before the permit was issued, and counties were given no voice in such determination. This

is strong evidence in support of the conclusion that these public rights in the navigable waters of our state were of paramount state-wide concern.

On the other hand, county boards, over a long period of years, may have legislated in certain fields, pursuant to state statutes delegating such power. In such instances, the historical background should be accorded considerable weight in determining whether a power so exercised by the counties over a long period might not primarily be one of local concern. In other words, the fact, that the counties have been permitted to exercise a certain delegated legislative power over a long period of years, is subject to the inference that the state has recognized that this is a field in which local interests are superior to those of the people of the state as a whole.

Decisions of this court arising under the "home-rule" amendment of our constitution (sec. 3, art. XI) throw considerable light upon the question of what subjects of legislative action are of primary state-wide concern, and which are not. Sec. 3, art. XI of the constitution, provides in part as follows:

"Cities and villages organized pursuant to state law are hereby empowered, to determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of *state-wide concern* as shall with uniformity affect every city or every village." (Emphasis supplied.)

In the decision in *Van Gilder v. Madison* (1936), 222 Wis. 58, 267 N. W. 25, 268 N. W. 108, the question presented was whether, under the above-quoted provision of sec. 3, art. XI of the constitution, a city could, by adoption of a charter ordinance, remove itself from the operation of a state statute prohibiting cities from reducing policemen's salaries unless the decrease were recommended by the board of police and fire commissioners. The court held that the

compensation of police officers of the city is a matter of "state-wide concern" and not a "local affair" within the meaning of the "home-rule" amendment. Therefore, the court determined that the part of the charter ordinance which attempted to remove the city from the operation of the statute relating to reduction of policemen's pay to be invalid. However, the court clearly recognized that the problem of drawing the line was difficult for the reason that the functions of state and local governments necessarily overlap, and quoted with approval from the concurring opinion of Mr. Chief Judge·CARDOZO in *Adler v. Deegan* (1929), 251 N. Y. 467, 489, 167 N. E. 705, as follows:

"There are some affairs intimately connected with the exercise by the city of its corporate functions, which are city affairs only. Illustrations of these I have given, the laying out of parks, the building of recreation piers, the institution of public concerts. Many more could be enumerated. Most important of all perhaps is the control of the locality over payments from the local purse. (*Matter of Mayor, etc., of N. Y.* [*Elm street*], 246 N. Y. 72, 158 N. E. 24.) *There are other affairs exclusively those of the state,* such as the law of domestic relations, of wills, of inheritance, of contracts, of crimes not essentially local (for example, larceny or forgery), the organization of courts, the procedure therein. . . . A zone, however, exists where state and city concerns overlap and intermingle. The constitution and the statute will not be read as enjoining an impossible dichotomy." (Emphasis supplied.)

The proper construction of the "home-rule" amendment also was before the court in the building-height case of *State ex rel. Ekern v. Milwaukee* (1926), 190 Wis. 633, 639, 209 N. W. 860. The court in its decision stated:

"In determining, as we now do, that the maximum height of buildings in a city is a local affair of such city and therefore within the field of legislative powers granted to cities and villages by such amendment, though such affair may also well be of 'state-wide concern,' we recognize:

"That there are still matters of 'state-wide concern' as to which no independent legislative power is thereby granted to municipalities. For instance, as already squarely held in *State ex rel. Harbach v. Mayor, etc.* 189 Wis. 84, 206 N. W. 210, they cannot control or enter into the field of school matters, a subject so carefully and separately safeguarded by art. X, Const. The same view was taken as to schools in *Niehaus v. State,* 111 Ohio St. 47, 54, 144 N. E. 433; there may also be many health regulations superior under general laws; so also exclusive control over methods and means of transportation, vested by general law in state administrative bodies (*Vanderwerker v. Superior,* 179 Wis. 638, 643, 192 N. W. 60; *Scheible v. Hogan,* 113 Ohio St. 83, 148 N. E. 581); and the same as to crimes (*Buchanan v. State* (Okla. Cr. App.), 236 Pac. 903), and possibly many other subjects which from their nature are state-wide and not local within a proper construction of this amendment; but any such questions are not here presented or now decided.

"We also recognize that many matters while of 'state-wide concern,' affecting the people and state at large somewhat remotely and indirectly, yet at the same time affect the individual municipalities directly and intimately, can consistently be, and are, 'local affairs' of this amendment."

There is no inconsistency in the different results reached by this court in *State ex rel. Ekern v. Milwaukee* and *Van Gilder v. Madison.* In both cases the court was confronted with a subject of legislation which partook both of the nature of a *"local affair"* and also that of *"state-wide concern,"* but in the former case it held that the matter was primarily a *"local affair,"* while the latter decision held that the *"state-wide concern"* feature was paramount.

We have cited in our original opinion in this case a number of decisions of this court to the effect that the state holds the navigable waters of this state in trust for the public, and that such trust extends to the uses of such waters for fishing, hunting, and other recreational purposes, as well as for pure navigation. This raises the additional question of whether the state, as trustee, can lawfully delegate to an agency of the

state, such as a county board, the power to determine that the Public Service Commission, in passing on the application for a permit to construct a dam, shall, or shall not, consider the effect that the construction of a proposed dam will have on public rights to the enjoyment of fishing, hunting, and scenic beauty in the stream.

Counsel for the respondent company contend that the trust extends only to rights of navigation and not to other public rights based on the recreational enjoyment of public waters such as fishing, hunting, and scenic beauty. In support of such contention we are cited to the following statement appearing in the decision in *Krenz v. Nichols* (1928), 197 Wis. 394, 402, 222 N. W. 300:

"While hunting and fishing may be an incident of navigation it does not depend on navigation, nor does navigation depend upon the privilege of hunting and fishing. They are distinct and independent of each other, and are drawn from different sources. Nor can it be reasonably said that hunting and fishing are in any way protected by the Ordinance of 1787 or the constitution of this state incorporating the same therein. The phrase 'forever free' refers to the 'common highways' and protects such highways from 'any tax, duty, or impost therefor.'"

The point at issue in *Krenz v. Nichols* was the validity of a statute licensing muskrat farms, which statute it was contended made it unlawful for the public to trap muskrats in certain public waters as to which the license to operate a muskrat farm had been granted. The above-quoted statement in the opinion was unnecessary to support the conclusion reached that the statute was valid. If the state has power to prohibit trapping of muskrats in certain waters as a regulatory measure in the interests of conservation, it also has the power, in carrying out the same policy, of prohibiting the trapping of muskrats in waters embraced within an area to which a muskrat fur-farm license extends.

The early decisions of this court which promulgated the trust doctrine with respect to our navigable waters were grounded upon the wording of the Northwest Ordinance, as incorporated verbatim in sec. 1, art. IX of the Wisconsin constitution; and the statement quoted supra from the decision in *Krenz v. Nichols,* to the effect that neither hunting nor fishing were protected by the Northwest Ordinance, is probably historically true. However, as disclosed by the decisions cited in the original opinion in the instant case, and particularly in *Diana Shooting Club v. Husting* (1914), 156 Wis. 261, 271, 145 N. W. 816, the trust doctrine has been expanded to include fishing, hunting, and other public rights in the recreational enjoyment of the navigable waters of the state. Furthermore, in the *Diana Shooting Club v. Husting Case* it is expressly declared that the right of fishing and hunting are incident to the right to navigate. The trust doctrine has become so thoroughly embodied in the jurisprudence of this state that this court at this late date should not now repudiate the same, as it applies to rights of recreational enjoyment of our public waters, on the ground that the doctrine as so extended may be unsound from the standpoint of historical origin.

To justify such a repudiation of the trust doctrine would require a rather convincing showing that reasons of sound public policy demand it, but no such showing has been attempted. The fact, that in many of our navigable streams the recreational uses thereof far outweigh the use made of such streams for the purposes of navigation alone, strongly supports the premise that sound public policy requires the retention of the trust doctrine as so expanded.

It is a well-recognized principle of the law of trusts that a trustee charged with the duty of administering a trust cannot delegate to agents powers vested in the trustee which involve an exercise of judgment and discretion, though the trustee may delegate powers which are purely ministerial.

54 Am. Jur., Trusts, p. 244, sec. 309. The county is an agency of the state and it may be urged that the foregoing principle, if applied literally to the trusteeship of the state over navigable waters would be too stringent. For example, sec. 30.02 (1), Stats., does vest powers in counties and other municipalities to establish shore and dock or pier lines in navigable waters, but a map showing the same must be filed with, and approved by, the Public Service Commission before such lines are legally effective. Thus the paramount interest of the state is safeguarded. Such a limited delegation of power consistent with the trust is very different in character from that attempted by the "county board law," particularly inasmuch as the state retains the power to see that the trust is not vitiated. The delegation of power attempted in the "county board law" permits the *public right to the enjoyment of fishing, hunting, or natural scenic beauty* in a navigable stream to be seriously impaired or destroyed through action of a county board and the Public Service Commission action is rendered powerless thereby to intervene to protect these public rights. Such an attempted delegation of power by the legislature, involving as it does a complete abdication of the trust, is therefore void.

The "county board law" which we declared to be unconstitutional in our original opinion in this case, and to which conclusion we herein adhere, is contained in the last portion of sec. 31.06 (3), Stats., reading as follows:

". . . but in case of a dam or flowage located outside the boundaries of a state park or state forest no permit shall be denied on the ground that the construction of such proposed dam will violate the public right to the enjoyment of fishing, hunting, or natural scenic beauty if the county board or boards of the county or counties in which the proposed dam and the flowage created thereby are located by a two-thirds vote approve the construction of such dam."

As the above-quoted portion of sec. 31.06 (3), Stats., is only part of the amendment to such section embodied in

ch. 124, Laws of 1947, the further question is presented whether the "county board law" portion of the statute is severable from the remainder of that part of the statute embraced within such amendment wrought by the adoption of said ch. 124, Laws of 1947, so that the holding of the "county board law" unconstitutional would not invalidate any other portion of the statute.

Prior to the adoption of ch. 124, Laws of 1947, sec. 31.06 (3), Stats., had ever since the adoption of the 1929 amendment with respect to the enjoyment of scenic beauty, read as follows:

"At such hearing or any adjournment thereof the commission shall consider the application, and shall take evidence offered by the applicant and other persons in support thereof or in opposition thereto, may require the amendment of the application, and if it shall appear that the construction, operation, or maintenance of the proposed dam will not materially obstruct existing navigation or violate other public rights and will not endanger life, health, or property, the commission shall so find and a permit is hereby granted to the applicant. *The enjoyment of natural scenic beauty is declared to be a public right, and if the commission shall find that the construction, operation, or maintenance of a proposed dam is contrary to the public interest, when the public right to the enjoyment of natural scenic beauty is considered, no permit shall issue.*" (Italics supplied.)

Ch. 124, Laws of 1947, struck out the italicized second sentence, and added all of the material now found in sec. 31.06 (3), Stats. 1951, except the first sentence retained from the former statute. The attorney general states in his brief that these added provisions, with the exception of the "county board law," are but declaratory of the prior existing practice of the Public Service Commission in passing on applications for permits to build dams, under which practice the element of enjoyment of scenic beauty received due consideration; and such statement of the attorney general is not challenged

by any of the other parties. If this be so, then the question of severability is of little practical importance, because if the "county board law" were held not to be severable then we would be compelled to hold all of ch. 124, Laws of 1947, invalid, which would leave sec. 31.06 (3) in the form in which it was prior to the adoption of said ch. 124. Under no circumstances could we arrive at a result whereby it would be held that all of ch. 124 was invalid, except that part which struck out the second sentence of sec. 31.06 (3), such being the sentence added by the 1929 amendment.

The test of severability which has been adopted by this court is well stated by Mr. Justice (later Chief Justice) WINSLOW, in *Quiggle v. Herman* (1907), 131 Wis. 379, 382, 111 N. W. 479, as follows:

"It is well understood that part of a statute may be unconstitutional and the remainder may still have effect, provided the two parts are distinct and separable and are not dependent upon each other. It is only where the void part of a statute was evidently designed as compensation for or an inducement to the otherwise valid portion, so that it must be presumed that the legislature would not have passed one portion without the other, that the whole statute must be held void. *State ex rel. Walsh v. Dousman,* 28 Wis. 541; *Gilbert-Arnold L. Co. v. Superior,* 91 Wis. 353, 64 N. W. 999."

Under the foregoing test the "county board law" is clearly severable from the remaining portions of ch. 124, Laws of 1947. No portion of the remaining statute is dependent upon it, and it is distinct and separable from such other provisions. As the new provisions which the legislature inserted in lieu of the portion struck out (the stricken sentence being that which embraced the 1929 amendment) did not enlarge upon the consideration and weight which the commission was already according to scenic beauty in passing upon application to construct dams, it would be extremely difficult to arrive at a conclusion that the "county board law" was

designed as a compensation for the enactment of this other portion of ch. 124.

We therefore hold that the "county board law" is severable from the remainder of sec. 31.06 (3), Stats., and its invalidity does not affect the validity of any other portion of said statute.

Sec. 370.001 (11), Stats., enacted by the 1951 legislature, provides as follows:

"*Severability.* The provisions of the statutes are severable. The provisions of any session law are severable. If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application."

It is urged that this statute is determinative of the issue of severability in the instant case. We prefer, however, to ground our conclusion as to severability upon the prior decisions of this court, rather than upon sec. 370.001 (11), Stats., because by so doing we avoid the necessity of determining such troublesome questions as whether such statute is retrospective in effect so as to apply to statutes enacted by prior legislatures, or whether it is, or is not, but declaratory of the existing common law of the state.

There is one statement of the court made in the original opinion in this case which should be corrected. We therein stated (ante, p. 513):

"The Public Service Commission in conducting hearings upon applications made under ch. 31, Stats., for the erection of a dam in a navigable stream, and making its findings on the issues presented, *is acting in a judicial capacity.*"

The commission, being an administrative agency and not a court, never acts in a strictly judicial capacity, and the italicized portion of the foregoing statement is amended to read "is acting in a quasi-judicial capacity."

*By the Court.*—The previous mandate is affirmed.