BRANCH, Appellant, v. OCONTO COUNTY, Respondent.*

*April 7—May 2, 1961.*

---

\* Motion for rehearing denied, with $25 costs, on June 27, 1961.

For the appellant there was a brief and oral argument by *Howard W. Eslien* of Oconto Falls.

For the respondent there was a brief and oral argument by *Edward P. Herald,* special district attorney.

FAIRCHILD, J. 1. *Validity of sec. 23.09 (14), Stats.* Sec. 23.09 (14) provides:

"*Ways to waters.* The county board of any county may condemn a right of way for any public highway to any navigable stream, lake, or other navigable waters. Such right of way shall be not less than 60 feet in width, and may be condemned in the manner provided by chapter 32; but the legality or constitutionality of this provision shall in nowise affect the legality or constitutionality of the rest of this section."

There was testimony as to the depth of Christy lake, the use of boats by hunters, and the existence of an outlet

stream. The owner has made no claim that it is not navigable.

The claim is made, however, that condemnation of a right of way for public access to the lake is unconstitutional, particularly where duck hunting is the sole purpose to be served.

Counsel cites decisions from other states, but they appear to involve different situations. Thus, in *Osceola County v. Triple E Development Co.* (Fla. 1956), 90 So. (2d) 600, the purpose of the condemnation was to provide a road to the shores of nonnavigable and privately owned lakes. In *Albright v. Sussex County Lake & Park Comm.* (1904), 71 N. J. L. (42 Vr.) 303, 57 Atl. 398, the statute provided for condemnation of "rights of fishing" apparently in privately owned waters. The court held it unconstitutional, but indicated that it might have been valid if it had provided for taking of the entire lake.

The situation now presented is different, especially in view of legal doctrines recognized in Wisconsin. Wisconsin holds the beds underlying navigable lakes in trust for all of its citizens. Hunting is one of the uses of water which are recognized as public purposes of the trust. *Muench v. Public Service Comm.* (1952), 261 Wis. 492, 501, 507, 515g, and 515j to 515-1, 53 N. W. (2d) 514, 55 N. W. (2d) 40; *State v. Public Service Comm.* (1957), 275 Wis. 112, 118, 81 N. W. (2d) 71. Creation of a public way to the edge of a navigable lake which the public cannot otherwise conveniently reach simply permits the public to enjoy the activities for which the state holds the title in trust.

We conclude that sec. 23.09 (14), Stats., is valid. There is nothing in the present record to show that it is being improperly applied here so as to effect a private rather than a public purpose.

2. *Determination of necessity.* The county seems to have proceeded under sec. 32.07 (1), Stats. 1957, as if it were

a city or village. The county could, however, and presumably did, determine for itself the necessity of the taking under sub. (2). Any judicial review of its determination is very limited. We have held:

"The determination of necessity is primarily for the legislature, and the judgment of the party to whom such determination has been delegated (in this case the Power Company) is beyond question by any court if there is reasonable ground to support it. . . .

"The right to locate the power line is given to the Power Company and the location cannot be challenged unless that right is arbitrarily or oppressively exercised. *Blair v. Milwaukee E. R. & L. Co.* 187 Wis. 552, 558, 203 N. W. 912. A court will not interfere with the choice unless necessary to prevent an abuse of discretion by an attempted taking in utter disregard of necessity for it. *Swenson v. Milwaukee County,* 266 Wis. 129, 133, 63 N. W. (2d) 103. Where a condemnor is given the right by statute to determine necessity, its choice of location cannot be challenged on the ground that another location on its own land would be as convenient and cheaper. *Swenson v. Milwaukee County,* 266 Wis. 129, 132, 63 N. W. (2d) 103.

"In the light of these principles, it is not for the court to decide whether the Power Company is making the best decision with respect to location of its power circuits or the need for acquiring the desired easement. Judicial interference with the utility's determination would at most be warranted only by a convincing showing that the determination is unreasonable, arbitrary, or not made in good faith." [1]

Even assuming that this condemnation must be controlled by sec. 32.07 (1), Stats. 1957, because the county chose to proceed as if so controlled, the owner did waive a jury trial. And if there is any infirmity because the question of necessity was apparently determined by the judge in his administrative capacity rather than by the court without a jury, no

---

[1] *Klump v. Cybulski* (1957), 274 Wis. 604, 612, 81 N. W. (2d) 42.

objection has been raised in that respect.[2] We conclude that in any event, the owner was not entitled to have the question of necessity submitted to the jury upon the appeal from the award.

There was testimony that between 50 and 60 people hunted ducks on Christy lake in the past. It appeared, however, that after Branch began charging a fee of $1 for duck-hunting privileges, the number dwindled from 23 in 1953 to six in 1955. In 1956, after Branch notified six people not to use his land for hunting, no one hunted there. Gillett, a city of 1,140, is a mile and a half from Christy lake. There was testimony that the lake was one of the best habitats for ducks in that area, and that it is the only natural duck-hunting lake in the county. The particular parcel to be condemned was selected because it was the highest land and provided the most-advantageous way to get in to the lake. The president of the local and county sportsmen's organizations testified that he had presented petitions to the county board for the opening of access. A representative of the state conservation commission testified that the commission policy is in favor of access in to waters of this nature, although Christy lake would not fit into the commission's own program of acquisition of public hunting grounds. He explained that the latter was true because the acreage was limited, and if widely advertised the lake would attract so many hunters that it would nullify itself as a hunting area.

Since the legislature has authorized condemnation of access to navigable water, and since hunting is one of the recognized public purposes for which any navigable water may be used by the public in Wisconsin, the issue of necessity in this case may not be much broader in scope than it was

[2] For a discussion of the peculiar character of an action to determine the issue of necessity under sub. (1), see *Madison v. Tiedeman* (1957), 1 Wis. (2d) 136, 83 N. W. (2d) 694.

in *Klump v. Cybulski, supra,* footnote 1, where the location of a power line was involved. In any event, we think that the determination of necessity has not been shown to be unreasonable, arbitrary, or not made in good faith.

3. *Damages.* Branch testified that he has a fur-farm license, and hopes to develop his property in this direction; that he paid $2,500 for his land in 1953, and has spent about $9,000 in building a house which is not yet complete. He intends to improve the land and lake for duck hunting, and trapping, and testified that the muskrat population has increased since he has owned the property. He testified that if people have access to the lake, it would be useless for him to have a hunting club which he believes would otherwise be profitable. He testified that the strip condemned by the county is almost valueless, but that its importance is that it keeps his rights in the lake.

Three witnesses were called by the county as experts and stated their opinions as to the value of the Branch property. Valuations before the taking ranged from $9,000 to $10,200, and after the taking from $8,900 to $9,700. The differences in value resulting from the taking thus ranged from $100 to $500.

The only apparently qualified expert called by the owner testified that in his opinion the value was $12,400 before the taking and would be $4,000 after the taking, or a difference of $8,400. This witness testified, however, that: "The most weight was placed on severance damages;" that Branch would be in a different position after the taking, "In that he owned or controlled the lake by owning the property around the lake where he had control of it. As soon as there would be an access to the road he would no longer have his control of the lake."

If the opinion of this witness be disregarded, there would be no support for the proposition that the difference

in value as a result of the taking would be $3,500 as found by the jury. In our opinion, the testimony of this witness is to be disregarded, if for no other reason, because of the weight admittedly given to the fact that before the taking, Branch was in a position to exclude the public from the lake, but would not be in such a position thereafter.

We have found no authority squarely in point upon the question whether a landowner who enjoys virtually private use of navigable waters because of his ability to exclude the public is entitled to damages for the loss of his monopoly when a parcel of his land is taken by the public to provide access.

In reason it seems that the benefit he is able to derive from exclusion of the public from the waters is not a right of property for which he is entitled to compensation. Upon the trial of a case of this sort, when an expert witness is asked to state his opinion of the value before the taking, it should be made plain that he is not to include any amount by reason of the owner's power to prevent public access to, and use of the navigable waters. The jury should be similarly instructed.

We have found authority dealing with a somewhat-related question, whether when land is especially adapted and available for a public use and such adaptability and availability adds to its market value, this feature must be taken into consideration. It is said:

"The very purpose of reserving in the people the power of eminent domain is to prevent an owner of a site especially available for a public work, but not of great value for other purposes, from trading upon the necessities of the public when it is sought to acquire his land for public use, and from compelling the public to pay for his land whatever figure he may name, and it seems clear that the owner has no such power. Consequently the market value of land peculiarly adapted for public use has been held to be its value apart

from such adaptability, plus such sum as a purchaser would have added to that value by reason of the chance that the land might be required for public use and that in such case, to avoid the expense and dangers of litigation, the public agency requiring it would pay rather more than the value for other purposes, and whether as a matter of justice or public policy the landowner is entitled even to this increment is open to considerable doubt." [3]

A somewhat-similar problem has recently been considered by the United States supreme court. [4] In that case, the United States condemned land adjoining a navigable river, and the court held that the just compensation which the Fifth amendment requires to be paid does not include the value of the water power in the flow of the stream.. The court pointed out that the realization of such value was dependent solely upon action of the government.

"What the government can grant or withhold and exploit for its own benefit has a value that is peculiar to it and that no other user enjoys. . . . To require the United States to pay for this water-power value would be to create private claims in the public domain."

While the situation there considered is different from the one before us, the principle that the owner of land is not entitled to a private claim in the public domain is applicable to both.

We note that the county took a strip 50 feet wide, although the statute commands that the width be a minimum of 60 feet. The county and the owner stipulated that the width be 50 feet, rather than 60 feet as provided by the statute. We think it is not good policy for the county to de-

---

[3] 4 Nichols, Eminent Domain (3d ed.), pp. 114, 117, sec. 12.315, Special availability for public use.

[4] *United States v. Twin City Power Co.* (1956), 350 U. S. 222, 228, 76 Sup. Ct. 259, 100 L. Ed. 240. See also *United States v. Virginia Electric & Power Co.* (1961), 365 U. S. 624, 81 Sup. Ct. 784, 5 L. Ed. (2d) 838.

part from the minimum requirements of the statute, but because of the owner's stipulation he is in no position to object.

*By the Court.*—Judgment affirmed.

DIETERICH, J., dissents.