DeGAYNER & COMPANY, INC., Appellant, v. DEPARTMENT OF NATURAL RESOURCES, Respondent.

*No. 625 (1974). Argued November 24, 1975.—Decided December 19, 1975.*
(Also reported in 236 N. W. 2d 217.)

For the appellant there were briefs by *Axley, Brynelson, Herrick & Gehl* of Madison, and oral argument by *Eugene O. Gehl.*

For the respondent the cause was argued by *Steven B. Wickland,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general, and a brief and oral argument by *John E. Kofron,* public intervenor.

A brief amicus curiae was filed by *Lawton & Cates* of Madison on behalf of William D. Beverly, Chairman Wild Rivers Committee, Sierra Club, John Muir Chapter; William A. Schultheis, Chairman Executive Committee, Sierra Club, John Muir Chapter; Thomas J. Rossberger; Lyman Williamson; B. C. Prentice; Robert J. Sneed; and the Sierra Club, John Muir Chapter.

HEFFERNAN, J.  This is an appeal from a judgment of the circuit court which sustained the order of the Department of Natural Resources (DNR) which held that Five Mile Creek, a tributary of the Namekagon river in Bayfield county, was navigable in fact. We affirm.

The record indicates that DeGayner & Company, Inc., was the sole riparian owner of Five Mile Creek. We are concerned with the navigability of that portion which runs from new county trunk M to the confluence of Five Mile Creek with the Namekagon river. That straight-line distance is approximately one mile. These

proceedings were initiated on December 1, 1972, by citizens who filed a petition with the DNR, asking that the DNR, pursuant to sec. 227.06, Stats., issue a declaratory order to decide whether certain portions of ch. 30 were applicable to Five Mile Creek.

The citizens' petition was impelled by the fact that DeGayner proposed the damming up of Five Mile Creek, the creation of an artificial lake, and the construction along its banks of approximately 500 housing units. If the stream is navigable, a permit must first be issued. Sec. 30.10 (2), Stats. At the hearing, the parties' counsel agreed that the applicability of the statutes was controlled by the central issue of whether the stream was navigable in fact. The finding that it was was affirmed by the circuit court for Dane county.

Although there was evidence produced at the hearing which would tend to show that the stream was navigable in fact, there was also a great deal of opinion testimony, primarily of employees of the DNR, that the stream was not navigable.

The test to be applied, however, is not whether there is a preponderance of evidence sufficient to sustain the findings of the DNR, but whether its finding was "[u]nsupported by substantial evidence in view of the entire record as submitted." Sec. 227.20 (1) (d), Stats.

*Robertson Transportation Co. v. Public Service Comm.* (1968), 39 Wis. 2d 653, 159 N. W. 2d 636, pointed out that a reviewing court, under that standard, may not reverse the administrative decision even though that decision is contrary to the great weight and clear preponderance of the evidence, if there is substantial evidence to support the finding.

More recently, the standards of review were reiterated in *Daly v. Natural Resources Board* (1973), 60 Wis. 2d 208, 219, 208 N. W. 2d 839. Therein we said:

" ' ". . . The basic case is *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 397, 34 N. W. 2d 238. That case pointed out that in reviewing administrative decisions, 'substantial evidence' did not include the idea of this court weighing the evidence to determine if a burden of proof was met or whether a view was supported by the preponderance of the evidence. Such tests are not applicable to administrative findings and decisions. We equated substantial evidence with that quantity and quality of evidence which a reasonable man could accept as adequate to support a conclusion. And, in this process, sec. 227.20 (1) (d), Stats., providing that the decision of an agency may be reversed if unsupported by substantial evidence in view of the entire record as submitted does not permit this court to pass on credibility or to reverse an administrative decision because it is against the great weight and clear preponderance of the evidence, if there is substantial evidence to sustain it.

" ' ". . .

" ' "[T]he term 'substantial evidence' should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside." ' "

The evidence adduced at the DNR hearing showed that Five Mile Creek in the one-mile segment under consideration was divisible into two approximately equal segments. The upper stream is a combination of beaver ponds and stream, and the lower portion is composed almost entirely of beaver ponds except for a few hundred feet, undisputably navigable, just upstream from the Namekagon river.

The appellant concedes that approximately 100 feet of the upper segment is navigable below the beaver

dams. The testimony appears to be reasonably clear that the stream was navigable, but only because of the existence of beaver dams.

The testimony shows that several persons attempted to canoe downstream from new county trunk M, and it is undisputed that each canoeist succeeded in canoeing to a point identified as XR–O, a point in a straight line distance approximately one mile downstream from new county trunk M. In fact, no canoeist was unable to complete whatever journey was undertaken.

Thomas J. Rossberger testified that on April 30, 1972, he traversed the distance in his canoe with the exception of one short area, where he was obliged to drag the canoe. It is not argued that occasional shoal areas or "drag areas" make the stream nonnavigable, since the record was replete with evidence showing that even in large and admittedly navigable rivers it is sometimes necessary to go around shallows or to drag a craft through them.

John Satterlee testified that he canoed from new county trunk M to the first haul road, a distance of approximately 1500 feet. He acknowledged that all but 100 to 200 feet of this distance was composed of beaver dam impoundments. It should be noted also that John Satterlee stated that, in the upper segment of the creek, there was sufficient water to float the canoe even if the beaver dams had not been present.

On November 18, 1972, John Walker also canoed the upper segment.

On the other hand, Howard Fallis, an employee of the DNR, testified that in 1957 he had attempted to work his way upstream with a shocker boat, a raft-like device which is used for shocking trout in order to make a stream fish count. He was able to bring the shocker boat up Five Mile Creek approximately 350 feet from its confluence with the Namekagon river. He concluded

that upstream, beyond that point, Five Mile Creek was not navigable because of the heavy overhanging brush and the diminished depth of the water.

Fallis also canoed a mile of the stream on April 21, 1972. He put in above the area that was marked "difficult" on the principal exhibit but was able to canoe downstream for almost a mile. He stated that he had no problem canoeing, but only because of the high-water levels due to the spring runoff. He also reported that there were three beaver dams on the segment he canoed and concluded that in some places these dams raised the water level 10 to 18 inches. He acknowledged that in this area on that date the creek was three or four feet deep. He also stated that he could have gone downstream beyond his take-out point if brush had been removed from the stream.

Fallis, as an experienced employee of the DNR, stated that, in his opinion, in the absence of the beaver ponds the stream was not navigable. On the date he canoed the stream, it was, however, navigable in fact. Fallis stated that the beaver ponds were not a natural condition of the creek, although he knew to his own knowledge that they had been in the stream for over twenty years. He also noted that, although he was able to canoe the stream, this was the result not only of the increased depth of the water because of the beaver ponds but because of the extreme flow conditions occasioned by the spring thaw. He acknowledged that such extreme flow conditions may last several weeks. There was testimony that Five Mile Creek carried water throughout the year.

A number of witnesses testified that they had observed the stream from two haul roads that intersected it, and they all agreed that it appeared to be canoeable as viewed from those roads.

Lyman Williamson, a former employee of the DNR, testified that he had observed the stream over a large

number of years, and to his own knowledge there had been beaver dams on it for at least thirty-seven years.

Two other employees of the DNR, Phillips and Donatell, testified that the stream was navigable only for a few hundred feet upstream from the Namekagon. Donatell, however, gave his opinion that the stream would be navigable if the beaver ponds were to be considered.

Richard J. Knitter, who testified that one of his duties was to determine navigability, inspected Five Mile Creek on two occasions, October 21, 1971, and May 31, 1972. He also concluded that the stream was nonnavigable in its natural condition and that the extent to which it was navigable was the result of the beaver dams. He explained the successful canoeists' trips as being the result of unusual flood-stage conditions, which he acknowledged could last several weeks each year. Knitter said that the appropriate test to be applied in determining navigability was whether the stream was navigable by canoe over 75 percent of its distance for 25 percent of the year. Fallis used the test of whether it was navigable over 75 percent of its distance for 10 percent of the year.

Wayne Trowbridge, a DeGayner employee, testified that he believed it possible to canoe Five Mile Creek, but that it would have been impossible to do so if the beaver ponds were not in existence.

It seems clear from this record that there was substantial evidence upon which the DNR, despite the opinion of its own employees, could conclude that Five Mile Creek was navigable in fact. It also appears, in respect to the lower portion of the stream, that the finding of navigability was based upon the fact that it was only the impoundment of waters by beaver dams that provided a depth suitable for canoeing.

Although it is argued by DeGayner that, even with the beaver dams in the stream, the stream was not navigable, for the dams in fact obstruct the stream as well as raise the water level, the principal thrust of

the appellant's argument is that it was improper to predicate navigability upon the existence of beaver dams, which, it argues, are artificial to the stream and tend to come and go. There was testimony that beaver leave a stream when the food supply is diminished. In addition, natural causes, such as spring washouts, frequently remove beaver dams even when beavers remain present.

It is also asserted that the DNR authorized the De Gayner Company to remove the beaver sometime in 1972 and to breach the dams. Accordingly, the appellant argues, at the time of the hearing, that beaver were not present and the dams no longer impounded the water. Suffice it to say that this latter argument is one upon which the appellant assumes the burden of proof, a burden which it did not discharge. There was no evidence, except of the vaguest type, to show that the dams had been breached at the time of the hearing or that all of the beaver had been removed. The appellant has asked for a remand and a rehearing to supplement proof in this respect. The appellant's proof was insufficient to show the absence of beaver and beaver dams at the time of the hearing. The request for further hearing on this issue was properly denied. Accordingly, the question posed is whether it was proper for the DNR to predicate its finding of navigability upon the presence of beaver dams.

The evidence shows that the beaver lived on the banks and in the water of Five Mile Creek for at least thirty-seven years. There was no evidence to show that the existence of beaver on the creek was transitory. No witness was able to testify that at any time in the past beaver were not present. While no single beaver dam remained intact for more than a few years, there was evidence to show that the beaver were constantly in the process of building and rebuilding dams in the creek. There was substantial evidence to show that the

existence of beaver was normal and natural to the Five Mile Creek.

A stream need not, however, be in its "normal or natural condition" when navigability is determined.

*Muench v. Public Service Comm.* (1952), 261 Wis. 492, 506, 53 N. W. 2d 514, 55 N. W. 2d 40, established the modern test of navigability:

> "[A]ny stream is *'navigable in fact'* which is capable of floating any boat, skiff, or canoe, of the shallowest draft used for recreational purposes."

There was evidence in the instant case to show that modern recreational canoes and kayaks could successfully be used for recreational purposes in as little as three inches of water. Moreover, there are no requirements in the Wisconsin law that only "normal or natural conditions" are to be considered in determining navigability.

In the landmark case of *Olson v. Merrill* (1877), 42 Wis. 203, this court held that the creek under consideration did not have to be navigable in its low-water condition or its normal condition for it to be a navigable stream. The court said:

> " 'Nor is it essential to the public easement that the capacity of the stream . . . should be continuous; or, in other words, that its ordinary state, at all seasons of the year, should be such as to make it navigable. If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes, and recurring as regularly as the seasons, and if its periods of high water or navigable capacity ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement.' " (P. 212)

The facts of *Olson* show that the stream was not navigable when in the low stage, or even in the ordinary stage, of water, but was only navigable during periodic

rises of the stream, which varied in their duration from four to thirteen days.

In *Falls Mfg. Co. v. Oconto River Improvement Co.* (1894), 87 Wis. 134, 58 N. W. 257, the stream was held navigable despite the fact that it was navigable in fact only during the spring runoff period.

In *Willow River Club v. Wade* (1898), 100 Wis. 86, 76 N. W. 273, the stream was held navigable because, in times of high water, logs and rowboats could be floated upon it, although in normal conditions rowboats could not be floated but could only be dragged or pushed across the shallows.

Navigability, then, is not to be determined by the "normal" condition of the stream. It is also correct, as the trial court stated, that whether the circumstances creating navigability were natural or artificial is irrelevant. This court has frequently held that, where artificial conditions create navigability, the stream is navigable in fact where such conditions have existed for a period of time. *See: Attorney General ex rel. Becker v. Bay Boom Wild Rice & Fur Co.* (1920), 172 Wis. 363, 178 N. W. 569; *Village of Pewaukee v. Savoy* (1899), 103 Wis. 271, 79 N. W. 436; *Mendota Club v. Anderson* (1899), 101 Wis. 479, 78 N. W. 185; *Johnson v. Eimerman* (1909), 140 Wis. 327, 122 N. W. 775; *Haase v. Kingston Co-operative Creamery Asso.* (1933), 212 Wis. 585, 250 N. W. 444.

Although some of these cases liken a condition created artificially to a right acquired by the public by prescription arising from circumstances that exist for over twenty years, the test is whether the stream has periods of navigable capacity which ordinarily recur from year to year, *e.g.*, spring freshets, or has continued navigable long enough to make it useful as a highway for recreation or commerce. The test is not whether the stream is navigable in a normal or natural condition, but whether it is in some sense permanently navigable, *i.e.*, regularly

recurring or of a duration sufficient to make it conducive to recreational uses.

In the instant case, beaver have existed on this stream for at least thirty-seven years. Some of the successful traversals of the stream were made at periods when there was no evidence of an unusual runoff. To the extent that the water levels were not "ordinary," they were nevertheless normal when viewed in light of regularly recurring seasonal fluctuations. While it is undoubtedly true that a single beaver dam is less permanent than a single man-made dam would normally be, in the instant situation we are concerned with as many as 11 beaver dams, each of which is no doubt transitory, but nevertheless has been rebuilt or relocated without interruption for a period of well over thirty years. While it is true, as the appellant says, that the dams created by beaver may be removed under certain provisions of the statute, this merely means that they are subject to removal only upon proper authorization, a situation not unlike that which is involved in the removal of man-made dams. Moreover, the statute requires that there be a showing of "damage" as the result of beaver activity.

Although we conclude that it is not essential that the navigability be caused by a natural condition, everything in this record indicates that the presence of beaver is natural and their absence from this stream, which has supported them continuously for almost forty years, is unnatural.

The DNR correctly concluded, under the evidence, that the beaver dams and ponds were normal and natural to Five Mile Creek, and that the periods of high water were of a regularly recurring annual nature. It was proper to consider those factors in determining the navigability of the stream.

While most of the experts of the DNR concluded that the stream was substantially nonnavigable, the DNR saw fit to disregard that testimony and gave credence to

their testimony only in part or relied upon the testimony of others. The credibility and weight to be assigned to such opinions is, of course, for the DNR's expertise and not for this court. We are satisfied that there was substantial credible evidence to support the conclusion reached by the DNR, and that conclusion was not unreasonable in view of the record as a whole.

In this case every person who attempted to navigate some portion of Five Mile Creek from 1957 to 1972 actually succeeded in doing so. The only testimony which supports the conclusion that the stream was not navigable is based upon facts that do not exist—the absence of the beaver ponds. There is testimony that Five Mile Creek was successfully canoed almost its entire length, and even though that navigability was possible only during periods of high water, it is evident that high water was a recurring condition of the stream. There was substantial evidence to support the DNR's conclusion of navigability.

The Sierra Club as amicus curiae argues that, irrespective of whatever findings there may be in respect to the navigability of Five Mile Creek, it should be considered as a navigable water, because it is a tributary of a natural and valuable navigable resource, the Namekagon river. There is evidence to show that the flow of spring water from Five Mile Creek is important in maintaining the fish life and the water quality of the Namekagon river. The testimony of the DNR employees was in accord with that conclusion. That test, proposed by the amicus Sierra Club, has not been recognized by the statutes or by the common law; and, as the trial judge pointed out, that test, in its simplistic form, can be carried to ridiculous extremes, for it would mean that all tributaries, since they eventually run into some navigable body of water, must be held navigable.

We are not, however, unmindful of the broad sweep of the modern test hinted at in *Muench v. Public Service*

*Comm., supra.* While *Muench* did indeed rely in part upon the legal conclusion that a stream is "navigable in fact" if it was capable of floating a craft of the shallowest draft for recreational purposes, the language of *Muench* seems to indicate that the test is a broader one than that which may be measured by Archimedean principles.

*Muench* remanded the case to the Public Service Commission "to make findings as to whether public rights for the recreational enjoyment of the stream in its present natural condition outweigh the benefits to the public which would result in the construction of the dam." (P. 515b) *Muench* pointed out that "the enjoyment of scenic beauty is a public right." (P. 508) Basically, then, the question may well come down to an issue far broader than navigability per se, *i.e.*, will the damming or obstruction of a stream destroy some beneficial interest of the public.

At least one of the witnesses in the instant case testified as to the unique beauty of Five Mile Creek—beauty which would be apparent only to one who is willing to undertake a rather arduous canoe trip. Moreover, the obstruction of the tributary might well affect the quality of the Namekagon river itself. Accordingly, it appears, under *Muench*, that navigability, *i.e.*, the ability to float a skiff of even the lightest nature, ought not to be the sole test to be applied in determining whether natural beauty should be supplanted by some man-made project.

Under that broader test foreshadowed by *Muench*, the question would appear to be whether any beneficial interest whatsoever of the public will be served by the continued existence of the original stream. Under such a rationale there is great merit in the general position urged in the amicus brief. That position is, however, more properly tested in subsequent proceedings to determine whether a permit to obstruct the stream should be

granted. It is not embraced in the traditional concept of "navigability," which the parties agreed at the outset was the only one to be considered in these declaratory proceedings.

We are not obliged in this proceeding to determine whether it is contrary to public policy for DeGayner to proceed with the construction which it proposes. This is a determination which must be reached by the appropriate agencies in light of the fact that we find Five Mile Creek navigable in fact.

*By the Court.*—Judgment affirmed.