# VILLAGE OF MENOMONEE FALLS, Petitioner-Appellant,†

## v.

# WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent.

Court of Appeals

*No. 86–1319. Argued March 25, 1987.—Decided July 1, 1987.*

(Also reported in 412 N.W.2d 505.)

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

580

On behalf of the petitioner-appellant there was a brief and oral argument by *Stephen W. Hayes* and *Michael J. Morse* of *von Briesen & Redmond, S.C.* of Milwaukee.

On behalf of the respondent the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general and *Ruby Jefferson-Moore,* assistant attorney general. There was oral argument by *Maryann Sumi,* assistant attorney general.

On behalf of the city of New Berlin, the villages of Sussex and North Prairie and the towns of Mukwonago, Lisbon and Brookfield there was an amicus brief by *T. Michael Schober* of New Berlin, *Arenz, Molter, Macy & Riffle* of Waukesha and *Cramer, Multhauf & Curran* of Waukesha. There was oral argument by *T. Michael Schober.*

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J. This case arises from the DNR's denial of permits to the Village of Menomonee Falls for a stormwater channelization project involving a waterway known as Lilly Creek. The Village[1] challenges the hearing examiner's determination, upheld by the circuit court, that Lilly Creek is a navigable stream. We hold that the examiner applied the correct test of navigability and that his conclusion of navigability was supported by substantial evidence. We further uphold the circuit court's ruling that the Village does not have statutory or constitutional authority to undertake the project without DNR permits. Because we also find no error in various procedural and evidentiary matters raised by the Village, we affirm the judgment in its entirety.

---

[1]The city of New Berlin, the villages of Sussex and North Prairie and the towns of Mukwonago, Lisbon and Brookfield, appearing as *amici curiae,* join the position of the Village of Menomonee Falls.

Lilly Creek is a tributary to the Menomonee River, lying within the Menomonee Falls village limits in Waukesha county. It is approximately 3.3 miles long with a watershed of about 5.16 square miles. To give an indication of the stream's size and variable flow, we note that it was at times characterized in these proceedings as a drainage ditch. However, the hearing examiner's findings of fact also characterize the creek as a "meandering stream with pools and ripples, lined with natural vegetation," used as a travel corridor for wildlife and containing the most diverse fishery of all the river's tributaries.

The Village, concerned with flooding, proposed to modify Lilly Creek's channel by dredging, grading the banks and installing either a concrete liner or a rock riprap on the channel bed. The Village also proposed dredging a detention basin at the upper (southern) end of the project. The channel modification would involve approximately 2.5 miles of Lilly Creek.

In April 1984, the Village applied to the DNR for permits under secs. 30.12, 30.19 and 30.195, Stats., for the proposed modifications.[2] The DNR opposed the applications. Following a hearing, hearing examiner Patrick T. Currie of the state's Division of Hearings and Appeals found that Lilly Creek was "navigable in fact" at the project site and denied the permits,

---

[2]Section 30.12, Stats., relates to the placing of material or structures on the bed of navigable water. Section 30.19, Stats., is concerned with dredging, grading and the connecting of artificial waterways to existing navigable water. Section 30.195, Stats., addresses changing the course of, or straightening, a navigable stream. All such actions are prohibited without permits under the above statutes unless otherwise authorized by the legislature.

finding that the proposed modifications were detrimental to the public interest.[3]

## NAVIGABILITY

Regarding navigability, the examiner found:

> While there is water in the Creek throughout the year, it is properly termed "intermittent." There are limited recreational uses made of the Creek, and navigation by recreational watercraft is a rare occurrence. Nonetheless, a canoe can be floated in the Creek at times of spring freshets and at other times of high water, and the Creek is navigable in fact at the site of the project.

The examiner's finding that Lilly Creek was navigable in fact was based at least in part on evidence that a DNR employee navigated the length of the creek in a canoe on February 25, 1985.

The Village argues that navigability in fact, or the pure ability to float a recreational boat or skiff, is not the sole test of navigability and that other factors must be considered and weighed in a decision regarding navigability.

 The determination of navigability begins with the statutes. Sections 30.12, 30.19 and 30.195, Stats.,

---

[3]The hearing examiner concluded that the channelization project was unnecessary, would destroy the scenic beauty of Lilly Creek, would cause significant harm to game habitat, would harm the fisheries of both Lilly Creek and the Menomonee River, would disrupt or destroy wetlands in the Lilly Creek basin, was inconsistent with the comprehensive Milwaukee River Priority Watershed Program, was unnecessarily large in scope and would adversely affect water quality and increase pollution in Lilly Creek and downstream.

require permits for certain alterations to or structures in *navigable* waters. If the waterway is not navigable, no permit is required. The term "navigable waters" within the meaning of ch. 30, Stats., for the purpose of establishing the state's jurisdiction, means waters that are navigable in fact. *See State v. Bleck,* 114 Wis. 2d 454, 459, 338 N.W.2d 492, 495 (1983).

This rule is based on the legislature's declaration of navigability. Section 30.10, Stats., provides in pertinent part:

> **(2) Streams.** Except as provided under sub. (4)(c), all streams, sloughs, bayous and marsh outlets, *which are navigable in fact for any purpose whatsoever,* are declared navigable to the extent that no dam, bridge or other obstruction shall be made in or over the same without the permission of the state. [Emphasis added.]

In 1952, in addressing the almost identical language of sec. 30.01(2), Stats. (1951), the supreme court established the modern test of "navigability in fact":

> [I]t is no longer necessary in determining navigability of streams to establish a past history of floating of logs, or other use of commercial transportation, because any stream is *"navigable in fact"* which is capable of floating any boat, skiff, or canoe, of the shallowest draft used for recreational purposes.

*Muench v. Public Serv. Comm'n,* 261 Wis. 492, 506, 53 N.W.2d 514, 519, 55 N.W.2d 40 (1952) (emphasis in original). The supreme court developed the modern test further in 1975 (albeit by applying century-old case law), holding:

586

> Navigability ... is not to be determined by the "normal" condition of the stream. ...
>
> ... [T]he test is whether the stream has periods of navigable capacity which ordinarily recur from year to year, *e.g.,* spring freshets, or has continued navigable long enough to make it useful as a highway for recreation or commerce. The test is not whether the stream is navigable in a normal or natural condition, but whether it is in some sense permanently navigable, *i.e.,* regularly recurring or of a duration sufficient to make it conducive to recreational uses.

*DeGayner & Co. v. DNR,* 70 Wis. 2d 936, 946–47, 236 N.W.2d 217, 222 (1975).

The Village asserts that in *Muench* and *DeGayner* the supreme court developed a test of navigability which requires a balancing of the public right to recreational enjoyment of the waterway in its present condition against the benefits of the proposed project. Because of the limited recreational use and the rarity of actual navigation of Lilly Creek, as acknowledged by the hearing examiner, and other factors including the urbanization of the surrounding area, the Village contends that such a balancing test would properly result in deeming Lilly Creek non-navigable.[4]

---

[4]The Village proposes a checklist for navigability, comprising:

1. Is the subject waterway capable of floating any boats, skiffs or canoes of the shallowest draft used for recreational purposes?

2. Do the conditions for such flotation exist at approximately the same time each year and for periods long enough for meaningful recreational or commercial use to be made of the waterway?

3. Historically, what has been the predominant use for the waterway?

4. What have been the incidental uses? Which uses will be significantly affected by a declaration of navigability? For exam-

The Village finds its basis for this interpretation in language from the *DeGayner* case. The *DeGayner* court stated, in response to a contention by the Sierra Club, as *amicus curiae*, that any tributary to a natural, valuable, navigable resource should be deemed navigable:

> We are not ... unmindful of the broad sweep of the modern test hinted at in *Muench v. Public Service Comm., supra.* While *Muench* did indeed rely in part upon the legal conclusion that a stream is "navigable in fact" if it was capable of floating a craft of the shallowest draft for recreational purposes, the language of *Muench* seems to indicate that the test is a broader one than that which may be measured by Archimedean principles.
>
> *Muench* remanded the case to the Public Service Commission "to make findings as to whether public rights for the recreational enjoyment of the stream in its present natural condition outweigh the benefits to the public which would result in the construction of the dam." (P. 515b) *Muench* pointed out that "the enjoyment of scenic beauty is a public right." (P. 508) Basically, then, the question may well come down to an issue far broader than navigability per se, *i.e.,* will the damming or obstruc-

ple, has the waterway been used meaningfully for commercial transportation or for such recreational pursuits as hunting, fishing, swimming, boating or ice skating?

5. Is the waterway located in an area that is urban, rural, or changing such that the predominant use and significant secondary uses of the waterway should be preserved or modified?

6. What impact will a declaration of navigability have on the affected populace?

7. When balancing those cases in which natural beauty may be supplanted by a manmade project, will beneficial interests of the public be served by the continued existence of the natural stream?

tion of a stream destroy some beneficial interest of the public.

 . . . .

 Under the broader test foreshadowed by *Muench,* the question would appear to be whether any beneficial interest whatsoever of the public will be served by the continued existence of the original stream.

*DeGayner,* 70 Wis. 2d at 948–49, 236 N.W.2d at 223–24. However, the Village fails to cite the language immediately following the above-quoted portion of *DeGayner:*

 Under such a rationale there is great merit in the general position urged in the amicus brief. *That position is, however, more properly tested in subsequent proceedings to determine whether a permit to obstruct the stream should be granted. It is not embraced in the traditional concept of "navigability,"* which the parties agreed at the outset was the only one to be considered in these declaratory proceedings.

 *We are not obliged in this proceeding to determine whether it is contrary to public policy for DeGayner to proceed with the construction which it proposes. This is a determination which must be reached by the appropriate agencies in light of the fact that we find Five Mile Creek navigable in fact.*

*Id.* at 949–50, 236 N.W.2d at 224 (emphasis added).

 Thus, it is apparent that regardless of the hypothetical scope of the broader test of navigability suggested in *DeGayner, DeGayner* actually affirmed that as the test of navigability now stands, navigability in fact is the keystone.[5] The balancing of public

-----

[5]To the extent *DeGayner & Co. v. DNR,* 70 Wis. 2d 936, 236

■■■■■■■■■■■

■■■■■■■■■■■■■■■■■

interests against the benefits to be gained from the proposed project occurs *after* a determination of navigability and pertains to the determination of whether to grant a permit for the project. *Id.* at 950, 236 N.W.2d at 224.

---

N.W.2d 217 (1975), hints that a "broader" test than simple navigability in fact might be proper, all indications are that this "broader" test would not take the form asserted by the Village. What *DeGayner* and its interpretation of *Muench v. Public Serv. Comm'n,* 261 Wis. 492, 53 N.W.2d 514, 55 N.W.2d 40 (1952), suggest is that the concept of navigability might be *expanded* to include the existence of a beneficial interest of the public, such as scenic beauty, as an independent ground for holding a waterway navigable. "[T]he question may well come down to an issue far broader than navigability per se, *i.e.,* will the damming or obstruction of a stream destroy some beneficial interest of the public." *DeGayner,* 70 Wis. 2d at 949, 236 N.W.2d at 223. Under this approach, the *DeGayner* court stated, the Sierra Club's position—that a stream should be held navigable *regardless of navigability in fact* if a beneficial interest of the public would thereby be served—had great merit. *Id.* at 949, 236 N.W.2d at 224.

In neither *Muench* nor *DeGayner* did the court indicate that under this "broader" test a stream which is navigable in fact might be considered non-navigable for the purpose of permit requirements. The relinquishment of state control over a waterway which is navigable in fact would be a major step away from established law and would raise serious questions regarding violation of the public trust doctrine, under which the state holds the beds underlying navigable waters in trust for all of its citizens. *See Muench,* 261 Wis. at 501–02, 53 N.W.2d at 517. While the trust doctrine has been expanded to include public rights in the recreational enjoyment of navigable waters, the doctrine is firmly grounded, historically, in the rights of navigation. *See id.* at 515-1, 55 N.W.2d at 45 (on rehearing). We cannot conceive that the development of additional protections for waterways with no history of commercial navigation has undercut the intrinsic value of navigability in fact under the trust doctrine.

590

This interpretation is completely consistent with *Muench.* In *Muench,* the court remanded for findings as to whether public rights in the recreational enjoyment of the stream outweighed the benefits to the public from the proposed dam. It apparently did so because the Public Service Commission had issued a permit without going through this balancing process, believing that no public rights existed requiring denial of the permit. *See Muench,* 261 Wis. at 497, 515a–15b, 53 N.W.2d at 515, 525 (including reporter's statement of facts and procedural status). Such a balancing was required by statute before issuance of a permit. Sec. 31.08, Stats. (1951); *see Muench,* 261 Wis. at 509, 53 N.W.2d at 521. The balancing of interests related not to the determination of navigability, which determination appears not to have been disputed in *Muench,* but rather to the issuance of a permit.

The *Bleck* case is a recent post-*DeGayner* confirmation that navigability in fact is the exclusive basis for the state's regulatory and enforcement jurisdiction. In *Bleck,* the petitioners contended that the state's jurisdiction did not extend to artificial bodies of water created on private lands. The supreme court rejected the argument that the state must establish both that the body of water is navigable in fact and that it is public:

> The circuit court found, and petitioners concede, that Bass Lake is navigable in fact. Once that fact is established, the lake must then be considered a navigable and public water under sec. 30.10. The state therefore established its regulatory and enforcement jurisdiction under secs. 30.12 and 30.15 .... . Navigability in fact having been proved, secs. 30.10(1) and (2) make it an inescapable conclusion

that the body of water is a navigable and public water.

*Bleck,* 114 Wis. 2d at 460, 338 N.W.2d at 495.[6]

The Village contends that sparse and irregular usage for recreational purposes does not and should not make the stream "navigable in fact." It cites cases from other jurisdictions to the effect that a waterway must be suitable and valuable for meaningful recreation before it is determined to be navigable for legal purposes. *See Bott v. Commission of Natural Resources,* 327 N.W.2d 838 (Mich. 1982), and *Hitchings v. Del Rio Woods Recreation & Park Dist.,* 55 Cal. App. 3d 560, 127 Cal. Rptr. 830 (1976).

These cases do not reflect Wisconsin law. In *Bott,* the Michigan court noted only that in those states whose "recreational boating" test of navigability arose solely out of judicial decision, the test had not been applied to provide public access to streams unfit for meaningful recreation; *Bott* expressly distinguished the law of states such as Wisconsin whose test arises from state "constitutional or statutory commitment to public access to inland waters." *Bott,* 327 N.W.2d at 848 & n. 36.

In *Hitchings,* the California appeals court held that "navigability in law should not be based on mere navigability in fact during infrequent or brief periods of high or flood waters," but concluded that navigability for nine months a year was sufficient to make the river in question "suitable, useful and valuable as a

---

[6]The court went on to hold that one objecting to state jurisdiction on the ground that the body of water is an artificial body of water created on private land has the burden of persuasion on that question. *State v. Bleck,* 114 Wis. 2d 454, 460, 338 N.W.2d 492, 495 (1983).

public recreational highway" and thus navigable in law. 55 Cal. App. 3d at 570–71, 127 Cal. Rptr. at 836–37. This is clearly contrary to the Wisconsin rule expressed in *DeGayner,* which holds that navigable capacity during spring freshets is sufficient under the "navigable in fact" test. *See DeGayner,* 70 Wis. 2d at 946–47, 236 N.W.2d at 222.

The Village also expresses concern that under a strict navigability in fact test, for which seasonal periods of high water suffice, low-lying, periodically flooded backyards, streets and street gutters, drainage ditches and the like could be considered navigable and thus subject to state regulation. This concern may be allayed by reference to the legislative declaration of navigability. Section 30.10(1) and (2), Stats., declares navigable only *lakes, streams, sloughs, bayous,* and *marsh outlets* which are navigable in fact. Lilly Creek is undisputedly a stream. We are confident that there need be no fear that flooded backyards and street gutters will be declared navigable waters.

In light of the foregoing, we reject the Village's claim that the hearing examiner and circuit court applied an erroneous test of navigability. While the Village's proposed test of navigability is thoughtful and by no means inherently unreasonable, it is contrary to the law as it now stands. The sole test is navigability in fact, as defined in *Muench* and *DeGayner.* That test was correctly applied here.

The next question, therefore, is whether the examiner's conclusion that Lilly Creek is navigable in fact was supported by substantial evidence. *See* sec. 227.57(6), Stats. (formerly sec. 227.20(6), Stats. (1983–84)). We hold that it was.

The examiner found that "a canoe can be floated in the Creek at times of spring freshets and at other times of high water, and the Creek is navigable in fact at the site of the project." As noted previously, a DNR employee floated a canoe down the creek on February 25, 1985. The Village argues, however, that the water was exceptionally high on that occasion and that no credible evidence established that the same depth and flow were present on a regularly recurring basis, or that the condition was of sufficient duration to make the stream conducive to recreational use. *See DeGayner,* 70 Wis. 2d at 946–47, 236 N.W.2d at 222. The Village's own navigation test conducted on April 12, 1985 showed that despite relatively high water a canoe had to be dragged and pushed almost the entire length of the stream.

The administrative finding of navigability may only be reversed if unsupported by substantial evidence in view of the entire record. *DeGayner,* 70 Wis. 2d at 939, 236 N.W.2d at 219. The reviewing court is not permitted to pass on credibility or to reverse an administrative decision because it is against the great weight and clear preponderance of the evidence if there is substantial evidence to sustain it. *Id.* at 940, 236 N.W.2d at 219. Substantial evidence, for purposes of reviewing an administrative decision, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Gilbert v. Medical Examining Bd.,* 119 Wis. 2d 168, 195, 349 N.W.2d 68, 80 (1984).

In light of this standard, the circuit court correctly found the hearing examiner's determination that Lilly Creek was navigable on a recurring basis sup-

ported by substantial evidence. Patricia Trochlell, the DNR water management specialist who navigated Lilly Creek in a canoe on February 25, 1985, had in the course of her employment conducted over one hundred navigability tests per year. Trochlell opined that the creek would be navigable on a recurring basis. When at the site again on March 7, 1985, she believed she could have navigated the stream that day although the snow melt had passed and flow was not at its peak. In her opinion, she could probably navigate the stream even in a drier year.

J. Richard Madl, a twelve-year resident on Lilly Creek, stated that he had seen canoes on the creek. Richard Farrenkopf, the Village manager, testified that regular fluctuations in water depth occurred and that, if one had the courage to canoe through certain hazards on the creek, navigation would probably be possible for two or three weeks in the spring and perhaps a couple of weeks in the fall following heavier rainfall. Village engineering superintendent Jerry Brahm, a twenty-five year resident on Lilly Creek, stated that canoeing would be possible in the spring, due to a combination of snow melt and spring rains. He stated that a foot or more of flow appears in the spring and picks up again with the fall rains. Mike Henkel, who lived on Lilly Creek for twenty years, stated that as a youth he had swum, canoed, rafted and caught fish in Lilly Creek. He further answered in the affirmative when asked whether in his observation there was, on a regularly recurring basis, sufficient water in the stream to float a canoe. Neal O'Reilly, a DNR water quality planner who grew up in the Village, testified that relatively high volumes of water flow were typical during the spring snow melt and that the type of flow appearing on the day of

Trochlell's navigation occurred annually and typically several times during the year, primarily during the spring snow melt and after heavy thunderstorms.

There was, thus, substantial credible evidence to support the hearing examiner's determination.

## STATUTORY POWERS AND HOME RULE

The Village contends that, regardless of whether Lilly Creek is navigable, the Village has statutory and constitutional authority to undertake the channelization project without ch. 30, Stats., permits. These determinations present questions of law upon which we do not defer to the hearing examiner's or circuit court's conclusions. *See State v. Nixa,* 121 Wis. 2d 160, 163, 360 N.W.2d 52, 54 (Ct. App. 1984).

First, we reject the Village's contention that the home rule amendment, Wis. Const. art. XI, sec. 3,[7]

---

[7]The home rule amendment, art. XI, sec. 3 of the Wisconsin Constitution, provides in relevant part:

(1) Cities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of state-wide concern as with uniformity shall affect every city or every village. The method of such determination shall be prescribed by the legislature.

We question whether home rule powers may be invoked, as the Village does here, as a matter of sheer authority to act. The "method of such determination" referred to in the home rule amendment has been established by the legislature in sec. 66.01, Stats. That section sets forth the charter, charter amendment and charter ordinance as the manner of exercising home rule. *See also Save Our Fire Dept. Paramedics v. City of Appleton,* 131 Wis. 2d 366, 373–74, 389 N.W.2d 43, 46–47 (Ct. App. 1986). No action in the present case has been attempted by such means.

standing alone, gives the village board the authority to proceed with the channelization project without DNR permits. The home rule amendment gives municipalities the power to determine their local affairs, "subject only to this constitution and to ... enactments of the legislature of statewide concern ... ." *Id.* The free and unobstructed use of the state's navigable waters is a matter of statewide concern. *City of Madison v. Tolzmann,* 7 Wis. 2d 570, 575, 97 N.W.2d 513, 516 (1959). Chapter 30, Stats., regulates the area. Thus, any authority the Village has in the matter is not constitutional and must depend on a legislative grant of power. *See Wisconsin's Envtl. Decade, Inc. v. DNR,* 85 Wis. 2d 518, 530–31, 271 N.W.2d 69, 74–75 (1978); *see also Tavern League v. City of Madison,* 131 Wis. 2d 477, 483 n. 1, 389 N.W.2d 54, 55 (Ct. App. 1986) ("Because the state has entered the regulation of the liquor industry by enacting ch. 125, Stats., the Home Rule Amendment is inapplicable and we must look to the statutes to determine the city's authority.").

Thus, we turn to the Village's statutory arguments. The Village argues that sec. 61.34(1), Stats., grants the village board the management and control of Village affairs, including navigable waters within the Village,[8] and that sec. 61.36, Stats., authorizes it to

[8]Section 61.34(1), Stats., provides:

**General grant.** Except as otherwise provided by law, the village board shall have the management and control of the village property, finances, highways, streets, navigable waters, and the public service, and shall have power to act for the government and good order of the village, for its commercial benefit and for the health, safety, welfare and convenience of the public, and may carry its powers into effect by license, regulation, suppression, borrowing, taxation, special assessment, appropriation,. fine, imprisonment, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants and shall be limited only by express language.

alter, widen or straighten watercourses.[9] Thus, it argues that the legislature has granted village boards inherent powers regarding navigable waters notwithstanding ch. 30, Stats. The Village also points out that no permit is required under secs. 30.12(1), 30.19(1) and 30.195(1), Stats., where the legislature has authorized the structures, deposits or modifications, and claims that the legislative authorization required by those statutes is found in sec. 61.36.

We conclude that these statutes cannot be construed as the Village wishes. If the legislature has granted village boards the power to modify navigable waterways without DNR permits, even if, as the Village suggests, that authority is subject to the requirement that the board act in the public interest, the statutes as so construed would not be significantly distinguishable from the "county board law" struck down in *Muench*. That statute, the last portion of sec. 31.06(3), Stats. (1951), provided:

[I]n case of a dam or flowage located outside the boundaries of a state park or state forest no permit shall be denied on the ground that the construction of such proposed dam will violate the public right to the enjoyment of fishing, hunting, or natural scenic beauty if the county board or boards of the county or counties in which the proposed dam and

---

[9]Section 61.36, Stats., provides:

Without limitation because of enumeration, the village board may lay out, open, change, widen or extend roads, streets, alleys, sanitary and storm sewers, water mains, parks and other public grounds, and improve, repair or discontinue the same or any part thereof ... and may establish and open and construct drains, canals or sewers and alter, widen or straighten watercourses ....

the flowage created thereby are located by a two-thirds vote approve the construction of such dam.

The supreme court held that this law ran afoul of art. IV, sec. 22 of the Wisconsin Constitution,[10] which the court construed to mean that the state may only delegate to county boards powers of a local character and may not delegate powers over matters of state-wide concern. *Muench,* 261 Wis. at 515–15a, 53 N.W.2d at 524–25. "[I]nterference with public rights of hunting, fishing, and scenic beauty by the erection of a dam on a navigable stream is of statewide concern, even though the dam and the flowage created thereby are located in one or more particular counties." *Id.* at 515a, 53 N.W.2d at 524.

On rehearing, the *Muench* court explored in greater depth the concepts of "local" versus "state-wide" interests and developed the doctrine of paramount interests to determine when a matter lying within both spheres is deemed to be primarily of one sort or the other. From there, the court considered to what extent powers relating to the public trust in navigable waters might be delegated to "agencies" of the state, such as a county board.

The court distinguished between delegation which safeguards the state's paramount interest (such as the law allowing municipalities to establish shore and dock or pier lines in navigable waters, subject to the approval of the Public Service Commission) and that which allows that interest to be impaired or destroyed,

---

[10]Article IV, sec. 22 of the Wisconsin Constitution provides:

**Powers of county boards.** Section 22. The legislature may confer upon the boards of supervisors of the several counties of the state such powers of a local, legislative and administrative character as they shall from time to time prescribe.

and held that the latter would be void. *Id.* at 515m, 55 N.W.2d at 46 (on rehearing). The court concluded that the delegation attempted in the "county board law" permitted the public right to the enjoyment of fishing, hunting or natural scenic beauty to be seriously impaired or destroyed through action of a county board and the Public Service Commission was rendered powerless to intervene to protect those public rights; thus, the county board law, "involving as it does the complete abdication of the trust," was void. *Id.*

Four years later, the supreme court clarified that although the state may to some extent delegate its public trust authority over navigable waters, any such delegation must be in clear and unmistakable language and cannot be implied from the language of a general statute delegating police power to cities or villages. *Tolzmann,* 7 Wis. 2d at 575, 97 N.W.2d at 516.[11]

While the powers of village boards expressly include the power of "management and control" of navigable waters within the village pursuant to sec. 61.34(1), Stats., the general grant of powers in sec. 61.34(1) is qualified by the words "[e]xcept as otherwise provided by law." We must, as did the circuit court, construe the village board's "management and control" authority to be limited by ch. 30, Stats.

---

[11]*City of Madison v. Tolzmann,* 7 Wis. 2d 570, 97 N.W.2d 513 (1959), addressed sec. 62.11(5), Stats., and the powers of a city common council. Section 62.11(5) is the counterpart for cities to the sec. 61.34, Stats., grant of power to villages and contains identical language concerning management and control of navigable waters. Both sections were enacted as enabling legislation following the adoption of the home rule amendment, art. XI, sec. 3 of the Wisconsin Constitution.

In *Tolzmann,* the supreme court held that sec. 62.11(5), Stats., granting cities the power of management and control over navigable waters, did not authorize the city of Madison to license the boats using its lakes. *Id.* at 576, 97 N.W.2d at 517. The type of authority the city *could* exercise was recognized by the acknowledgement that the city could enact safety regulations relating to boats and their equipment. In another case involving the Madison lakes, the supreme court held that the city did not have authority, under its sec. 62.11(5) power of management and control, to prohibit chemical treatment of the lakes when the DNR had authorized such treatment. *Wisconsin's Envtl. Decade,* 85 Wis. 2d at 534–36, 271 N.W.2d at 76–77. The city's claim to the contrary ran "counter to the clear legislative pattern of vesting increasingly centralized authority over waters of the state in the DNR," as well as being inconsistent with express legislation on the topic of chemical treatment. *Id.* at 537, 271 N.W.2d at 77.

The Village's power of management and control over navigable waters is, clearly, not to be construed as a blanket delegation of the state's public trust authority. Whatever the bounds of such management and control may be, they cannot include the power to permanently alter the character of a navigable waterway without a permit from the state. Delegation of authority under the public trust doctrine is permissible when in furtherance of that trust and where delegation will not block the advancement of the paramount interests appurtenant to navigable waters. *Id.* at 534, 271 N.W.2d at 76. Delegation of a limited authority or responsibility to further proper public interests is to be distinguished from assignment of a right to block advancement of paramount interests.

601

*Menzer v. Village of Elkhart Lake*, 51 Wis. 2d 70, 78, 186 N.W.2d 290, 294–95 (1971). The law struck down in *Muench* was of the latter sort. Section 61.34(1), Stats., would be of the same sort if construed as the Village argues.

The same analysis applies to the Village board's express power, pursuant to sec. 61.36, Stats., to "construct drains, canals or sewers and alter, widen or straighten watercourses." Where such actions involve alterations to or structures in navigable waters, the provisions of ch. 30, Stats., must control. If this were not the case, the Village would have the right to block advancement of paramount interests in a navigable stream, contrary to the public trust doctrine. *See Menzer*, 51 Wis. 2d at 78, 186 N.W.2d at 294–95.

The Village argues that the authority granted in sec. 61.36, Stats., is the legislative authorization mentioned in secs. 30.12(1), 30.19(1) and 30.195(1), Stats., so that the general prohibitions of those sections do not apply.[12]

The 1959 legislative council notes to sec. 30.12, Stats., make plain that that statute's reference to "structures or deposits otherwise authorized by the legislature" does not refer to general grants of power such as sec. 61.36, Stats., but rather to particular

---

[12]The "otherwise authorized" language of the three sections varies. Section 30.12, Stats., states, "unless a permit has been granted by the department pursuant to statute or the legislature has otherwise authorized structures or deposits in navigable waters . . . ." Section 30.19, Stats., provides: "Unless a permit has been granted by the department or authorization has been granted by the legislature . . . ." Section 30.195, Stats., states, "No person shall change the course of or straighten a navigable stream without a permit therefor having been granted pursuant to this section or without being expressly authorized by statute to do so."

structures or deposits actually authorized by the legislature. Those notes state: "The legislature from time to time has passed many special acts as well as statutory provisions authorizing structures or deposits in navigable waters and the general prohibition ... clearly was not intended to make such structures and deposits unlawful." 1959 Legislative Council Notes, Wis. Stat. Ann. sec. 30.12 (West 1973). Similarly, the supreme court noted in 1955:

> Originally the legislature regulated the respective rights of riparian owners and of the public. The legislature itself granted franchises or permits for the construction of dams and log booms in particular. Later this authority was vested in the railroad commission, now the public service commission [and now the DNR] ... .

*Bond v. Wojahn,* 269 Wis. 235, 239–40, 69 N.W.2d 258, 260 (1955).

These sources are persuasive that at least in sec. 30.12, Stats., the "otherwise authorized" language refers to structures and deposits *specifically* authorized by the legislature, not to any general authorization to construct or maintain such structures and deposits.

We are not aware of legislative council notes regarding the analogous language in secs. 30.19 and 30.195, Stats. Even assuming that the language in those statutes is not limited to legislative authorization of particular projects, the public trust doctrine continues to constrain the interpretation of the powers the legislature may delegate to municipalities.

An argument similar to that made by the Village in the present case was made by a sewerage district

citing sec. 66.24(5)(c), Stats.,[13] as its authorization to construct a dike on the bed of a navigable lake in *Cassidy v. DNR*, 132 Wis. 2d 153, 162, 390 N.W.2d 81, 85 (Ct. App. 1986). The court there stated that if sec. 66.24(5)(c) unconditionally authorized utilities to place structures on the beds of navigable lakes it would be in irreconcilable conflict with sec. 30.12, Stats., and the trust doctrine. *Id.* The court held that sec. 66.24(5)(c) did not remove any of the requirements of sec. 30.12 but allowed the utility to maintain its structures, assuming it met all of the sec. 30.12 requirements, without paying compensation to the state. The same reasoning applies here. To interpret the authority provided in sec. 61.36, Stats., as bypassing the permit procedure of ch. 30, Stats., would violate the public trust doctrine.

## PROCEDURAL AND EVIDENTIARY ISSUES

The Village raises several additional claims on appeal.

First, the Village contends that the DNR should have had to prove navigability, or at least a prima facie case for navigability, at the outset of the hearing.

---

[13]Section 66.24(5)(c), Stats., provides:

*Waterways.* [A metropolitan sewerage] district shall have power to lay or construct and to forever maintain, without compensation to the state, any part of the utility system, or of its works, or appurtenances, over, upon or under any part of the bed of any river or of any land covered by any of the navigable waters of the state, the title to which is held by the state, and over, upon or under canals or through waterways, and if the same is deemed advisable by the commission, the proper officials of the state are authorized and directed upon application of the commission to execute, acknowledge and deliver such easements, or other grants, as may be proper for the purpose of carrying out the district operations.

To require merely that navigability must be establish-ed by the end of the hearing, the Village argues, had the effect of shifting the burden of proof to the Village to show that Lilly Creek is not navigable.

■
As the hearing examiner noted at the start of the hearing, the Village, not the DNR, was the applicant, or moving party, in these proceedings and bore the burden of proof in general. It is true that the DNR must ultimately prove that the body of water is navigable to establish its jurisdiction. *See Bleck,* 114 Wis. 2d at 459, 338 N.W.2d at 495. However, all that is required is that at the close of the evidence the hearing examiner be able to find, based upon all of the evidence, that jurisdiction is established.

Next, the Village argues that testimony concern-ing the Milwaukee River Priority Watershed Project (MRPWP) was irrelevant and should not have been admitted. The hearing examiner concluded that the channelization project was inconsistent with the MRPWP, "which seeks to implement a comprehen-sive, cohesive solution to stormwater management and nonpoint source pollution in the area that in-cludes the Lilly Creek basin."

The Village objected to the relevance of testimony concerning the MRPWP because the MRPWP is in its planning stages, is not yet fully funded and may not be fully implemented before 1994. A comparison between the channelization project and the "hypothetical" MRPWP, the Village claims, was speculative and improper.

■
We conclude that the as-yet incomplete status of the MRPWP goes to the weight rather than to the admissibility of the testimony. The DNR is charged

with the duty to administer the nonpoint source water pollution program under sec. 144.25, Stats., and to develop a comprehensive program to protect all the waters of the state pursuant to sec. 144.025(1), Stats. Testimony concerning the compatibility of the proposed Lilly Creek project with the goals and specific plans developed or being developed by the DNR in the MRPWP was clearly relevant to whether the Lilly Creek project was in the public interest. The DNR's left hand, its permit-granting hand, should know and take into account what its right hand, the comprehensive planning hand, is doing. The hearing examiner, as factfinder, was free to conclude that the MRPWP was too hypothetical or undeveloped to be given much weight. Apparently, he concluded otherwise. We perceive no error in this regard.

Neither do we agree that there was insufficient evidence to support the finding that the Lilly Creek project is incompatible with the MRPWP. The Village argues that the channelization project cannot be incompatible with the MRPWP because the DNR's prospectus regarding the latter expressly states, "[T]o the greatest extent possible, the [MRPWP] will recognize and be compatible with, the flood control and stormwater management plans already in existence within the basin." However, the Lilly Creek channelization is not "already in existence." Further, DNR environmental specialist Roger Bannerman testified, based on his experience with the Menomonee River Pilot Watershed study and other studies and his knowledge of the proposed MRPWP, that the Lilly Creek proposal will be "very inconsistent with" the MRPWP goals because it does not "mitigate as much as possible the pollution and amounts of water coming from the developing area." Pursuant to the "substan-

tial evidence" standard of review, we uphold the examiner's findings of fact on this issue.

The Village's next contention is that the examiner's findings concerning the negative aesthetic impact of the proposed project are speculative and that the very concept of aesthetics is too lacking in objective or articulated standards to allow for any meaningful review of these findings. It claims that "[a] reviewing court is left merely with the subjective opinions of individual witnesses, with no ability to compare or objectively review them." This state of affairs amounts to a denial of fundamental fairness and due process, the Village contends.

This argument ignores the fact that enjoyment of scenic beauty is one of the paramount interests appurtenant to navigable waters. *Muench,* 261 Wis. at 511–12, 515g, 53 N.W.2d at 522, 55 N.W.2d at 43. That being so, the fact that "beauty" and "aesthetics" are concepts not susceptible to precise measurement, being subjective by nature, cannot be held to prevent the state from protecting those interests.[14] They are indubitably proper factors to be considered in the determination of whether permits for a particular project should be granted. The citizens of Wisconsin have given the state the authority to protect the scenic beauty of public waters by means of the permit-granting process. The finding that the aesthetic value of a stream will be impaired by a project is a finding of

[14]For an overview of the developing judicial and legislative recognition of aesthetics as a valid ground for restraints on property interests, see Leighty, *Aesthetics as a Legal Basis for Environmental Control,* 17 Wayne L. Rev. 1347 (1971).

fact by the examiner which will be affirmed if there is substantial evidence to support it.

Certainly, more is required than a conclusory statement that a project will have a negative effect on aesthetics. Here, the examiner explained how such an effect would result:

> The project will destroy the scenic beauty of Lilly Creek as it now exists in its natural state, substituting the sterile, barren look of a concrete or riprap channel for the aesthetic value of a meandering stream with pools and ripples, lined with natural vegetation.

The examiner heard the opinions of several riparian owners regarding the natural beauty of Lilly Creek (which several cited as a principal reason they chose to buy their property) and how the project would negatively affect that beauty. The examiner also saw photographs of the area, which are part of the record on appeal. Substantial evidence supports his findings regarding aesthetics.

Next, the Village challenges the examiner's finding that the project would have a permanent impact on the wildlife along the creek by eliminating cover and food sources and lessening the creek's value as a travel corridor for wildlife. We conclude that there was ample evidence concerning the current diversity of fish and wildlife and the likely effects on the wildlife population of the damage to or elimination of creek habitats resulting from the project.

The Village contends that the examiner erred in refusing to reopen the hearing, before it had rendered its decision, to admit photographic evidence from the Village that the Lilly Creek bed is "traditionally" dry

and grasslined. This was a matter within the discretion of the examiner. *See Village of Prentice v. Transportation Comm'n,* 123 Wis. 2d 113, 121, 365 N.W.2d 899, 903 (Ct. App. 1985). The examiner had previously heard testimony that water flow in the creek was minimal or nonexistent in the summer. The *Muench/DeGayner* test does not require that flow be constant. We thus perceive no abuse of discretion in the examiner's refusal to admit the tardily proffered evidence.

Finally, the Village claims that the examiner improperly refused to admit evidence of contradictory recommendations made or positions taken by DNR personnel during the planning stages of the Lilly Creek project, refused to allow cross-examination of DNR witnesses concerning an environmental assessment report which discussed the project, and admitted unsubstantiated hearsay. Regarding the first of these subissues, the Village contends that the examiner admitted evidence concerning some matters, chiefly regarding funding availability, discussed during prehearing negotiations but excluded evidence of other statements also made during these negotiations, chiefly regarding the DNR's initial acceptance of certain portions of the channelization plan. The DNR counters that the examiner properly found that the former was relevant evidence while the latter was not.

Generally, evidence relating to settlement negotiations is not admissible. *See* sec. 807.01, Stats. While not bound by the rules of evidence, a hearing examiner is directed to admit testimony having reasonable probative value but to exclude immaterial or irrelevant testimony. Sec. 227.45(1), Stats. The examiner ruled that evidence concerning the particulars of alternative projects discussed was not relevant but

that the availability of funding for an alternative stormwater management plan was relevant evidence. Decisions on relevance are left to the discretion of the hearing examiner, just as they are to that of a trial court, and will be accepted unless there has been an abuse of discretion. *Cf. Keithley v. Keithley,* 95 Wis. 2d 136, 140, 289 N.W.2d 368, 371 (Ct. App. 1980). We will not disturb the hearing examiner's rulings.

Concerning cross-examination, the hearing examiner in fact ruled that the Village *would* be allowed to cross-examine witnesses regarding the content of the environmental assessment report (EA). Earlier, however, the examiner sustained the DNR's objections to the Village's attempt to establish a witness' familiarity with certain subjects on the basis that she had written the EA. It is those rulings the Village cites in claiming it was not allowed to cross-examine witnesses regarding the content of the EA. We conclude that those earlier rulings did not involve the issue argued on appeal and that the Village's contention is thus without merit.

Regarding the admission of hearsay, the supreme court has not decided to what extent hearsay evidence may be admissible before an administrative agency, but has held that administrative bodies should never ground administrative findings upon uncorroborated hearsay. *See Outagamie County v. Town of Brooklyn,* 18 Wis. 2d 303, 312 & n. 3, 118 N.W.2d 201, 206 (1962). Some evidentiary restrictions do apply, including those concerning hearsay not subject to a recognized exception. *City of Superior v. DILHR,* 84 Wis. 2d 663, 672 n. 6, 267 N.W.2d 637, 643 (1978).

We conclude that sufficient nonhearsay testimony supported the examiner's findings challenged on this ground—that the project was unnecessary and that viable alternatives to the project existed. Several riparian owners testified based on their own experience that flooding was not a problem. There was also testimony based on personal knowledge concerning alternatives to channelization. Thus, even if certain hearsay was erroneously admitted, the error has not been shown to be prejudicial.

Therefore, we affirm on all grounds the circuit court judgment which affirmed the order of the hearing examiner.

*By the Court.*—Judgment affirmed.