James Mews and Mews Companies, Inc.,
Petitioners-Appellants,

v.

WISCONSIN DEPARTMENT OF COMMERCE, Respondent-
Respondent.

Court of Appeals

*No. 03–0055. Oral argument October 29, 2003.—
Decided January 7, 2004.*

2004 WI App 24

(Also reported in 676 N.W.2d 160.)

On behalf of the petitioners-appellants, the cause was submitted on the briefs of *Pamela H. Schaefer* and *Carolyn A. Sullivan* of *Reinhart, Boerner, Van Deuren, S.C.,* Waukesha. There was oral argument by *Pamela H. Schaefer*.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Steven B. Wickland*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general. There was oral argument by *Steven B. Wickland*.

A nonparty brief was filed by *Thomas L. Skalmoski* of *Weiss Berzowski Brady LLP*, Milwaukee, for the Petroleum Marketers Ass'n of Wisconsin/Wisconsin Ass'n of Convenience Stores, Inc., Wisconsin Federation of Cooperatives, and Wisconsin Fabricare Institute.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. SNYDER, J. James Mews and Mews Companies, Inc. (together, Mews) appeal an order sustaining a Wisconsin Department of Commerce (DOC) decision limiting Mews's reimbursement for site clean-up expenses associated with contamination from three underground storage tanks. The crux of the dispute is whether the contamination emanating from these tanks constituted one "occurrence" under the Wisconsin Petroleum Environmental Cleanup Fund Act (PECFA), WIS. STAT. § 101.143 (2001–02),[1] WIS. ADMIN. CODE § Comm 47.01. Mews argues that the circuit court erred when it affirmed the DOC's determination that the excavation sites were a single occurrence for purposes of PECFA reimbursement. We disagree and affirm the order of the circuit court.

## FACTS

¶ 2. In 1984, Mews installed a 3000 gallon underground waste oil tank and two 10,000 gallon underground diesel tanks on the company's property. The waste oil tank was located approximately 140 feet from the two diesel tanks. In April 1993, all three of the underground tanks were removed because they were leaking and contaminating the surrounding area. As part of the remediation effort, Mews also removed and

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

replaced the contaminated soil until it came within the standards promulgated by the Department of Natural Resources (DNR). Excavation continued until "clean soil," under the DNR's definition, was found.

¶ 3. In 1994, Mews requested site closure from the DNR; however, monitoring wells revealed continuing contamination in the groundwater. The DNR required additional field studies, including soil borings and more groundwater monitoring wells. In 1996, the DNR asked Mews to remediate the site's groundwater contamination. Mews pumped water from the site and treated it to remove contaminants.

¶ 4. Initially, Mews, the DNR and the DOC all viewed the site as two separate claims. The waste oil tank and the diesel tank excavation sites were separated by approximately forty feet and an intersecting road. Costs for excavation of the diesel and the waste oil areas were tracked and claimed separately in Mews's first PECFA claim.

¶ 5. A DNR letter dated February 9, 1995, however, advised Mews that the "contamination plumes may have intermingled." In April 1996, the DOC issued a decision which stated, "According to the information received at this office the contamination plumes have intermingled, therefore the claims were combined as one and a single $7,500.00 deductible was assessed."

¶ 6. In 1997, tests confirmed that the groundwater contamination had abated and clean-up efforts stopped. Mews's second PECFA claim requested reimbursement of $151,690.05 and the DOC paid all but $8688.24 in September 1998. The DOC noted that Mews had reached the $500,000 reimbursement limit for a single PECFA occurrence.

¶ 7. In October 1998, the DOC denied Mews's third claim in its entirety, refusing to pay any of the

$54,103.39 requested. The DOC again indicated that Mews was ineligible because he had reached the PECFA reimbursement limit. The DNR ultimately closed the site in 1999.

¶ 8. Mews appealed the 1998 DOC decisions, arguing that because there were two separate excavation sites, there were two occurrences under PECFA. Mews could be reimbursed for up to $500,000 for one occurrence and up to $1,000,000 for two separate eligible occurrences. The appeals were consolidated and an administrative law judge (ALJ) sustained the DOC decision that there was only one eligible PECFA occurrence.

¶ 9. Mews filed a Chapter 227 petition for review in Waukesha county circuit court. After a hearing, the circuit court sustained the ALJ's decision. Mews appeals these decisions, seeks reversal, and requests relief in the amount of $162,000 plus any interest accrued since the filing.

## DISCUSSION

¶ 10. Mews raises three issues for review. First, he contends that the DOC used unwritten, and therefore illegal, standards to determine that there was only a single occurrence eligible for reimbursement. Second, Mews contends that the DOC and the DNR failed to hold a statutorily mandated interdepartmental meeting, causing much of the confusion that necessitated this appeal. Finally, Mews argues that because the DOC previously indicated that the Mews site included two separate occurrences, the DOC should be estopped from changing its position and reimbursing for only one occurrence.

¶ 11. In an appeal from a circuit court order in an administrative review proceeding, we review the agency's decision and not the order of the circuit court. *Motola v. LIRC*, 219 Wis. 2d 588, 597, 580 N.W.2d 297 (1998). The standard of review is proscribed by WIS. STAT. § 227.57, which states that we must affirm the ALJ's decision unless we find specific grounds for not affirming it. Sec. 227.57(2). Our review is limited to the administrative record. Sec. 227.57(1). We have stated that:

> A court may not substitute its judgment for that of an agency on an issue of discretion, sec. [227.57(8)], Stats., and must accord due weight to the experience, technical competence, and specialized knowledge of the agency, sec. [227.57(10)], Stats. A court should also accord great weight to an agency's interpretation of a statute that it administers.

*Eau Claire County v. DNR*, 119 Wis. 2d 62, 63–64, 349 N.W.2d 723 (Ct. App. 1984) (citation omitted). We will not reverse an administrative decision even if it is against the great weight and clear preponderance of the evidence where there is substantial evidence to sustain it. *Village of Menomonee Falls v. DNR*, 140 Wis. 2d 579, 594, 412 N.W.2d 505 (Ct. App. 1987). Substantial evidence, for the purpose of reviewing an administrative decision, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

¶ 12. Mews contends that the DOC employed unwritten, uncodified definitions to determine that there was only one occurrence, thereby violating WIS. STAT. § 227.10(1), which states in relevant part: "Each agency shall promulgate as a rule each statement of

general policy and each interpretation of a statute which it specifically adopts to govern its enforcement or administration of that statute."

¶ 13. Mews acknowledges that the statutory definition of "occurrence" states that it is "a contiguous contaminated area resulting from one or more petroleum products discharges." WIS. STAT. § 101.143(1)(cs). Mews's challenge is directed at the DOC's interpretation and application of this definition; specifically, how the DOC interprets and applies the term "contiguous."

¶ 14. At the administrative hearing, the DOC presented testimony by PECFA hydrogeologist Kelly Kochis, who explained her process for determining whether contamination is "contiguous." She testified that "the boundaries of the occurrence are established by the extent of the impacted soil or groundwater" and that "no detect" would mean an area that is "unimpacted." She further explained that to find two occurrences, one would need to prove there was "an unimpacted area of soil between two otherwise eligible PECFA locations or sites." In reviewing the specific data associated with the Mews site, Kochis opined that "there's no break—there's no place that there is no detects." She also explained that she found "contamination between these source areas that is below the DNR regs, but it's there . . . [e]ven though [it] does not require cleanup, it—the contamination exists in that location."

■

¶ 15. Mews argues that terms like "no detects" and "unimpacted area of soil" are unwritten definitions that function as a rule and, as such, are illegal because they were not adopted pursuant to WIS. STAT. § 227.10(1). The DOC counters that the statutory definition of "occurrence" is clear and unambiguous. Citing

649

Kochis's testimony, the DOC asserts that only a common sense definition, not a codified rule, is necessary to determine whether contamination is "contiguous." Kochis explained as follows: "There is not a clean, unimpacted place that has been discovered between the two excavations. Thus . . . without an area of unimpacted, no detects, the occurrence never ended . . . . The two source areas met." We agree with the DOC. We conclude that the DOC presented substantial record evidence that the excavation sites were contiguous under the PECFA definition of "occurrence."

¶ 16. Mews further contends that because the standards used by the DNR were inconsistent with those used by the DOC to determine what constitutes "clean soil" or an "unimpacted area," Mews was placed in an untenable position. Mews points out that some of the soil between the two excavation sites tested "below the DNR clean-up levels" and that "there was clean soil between the excavations according to applicable DNR standards." Kochis confirms this in her testimony. The ALJ, however, determined that "the fact that the commingling [of contaminants from the original tanks] is below DNR clean-up levels does not eliminate the fact that commingling can still occur resulting in one occurrence per the PECFA program." We agree. The DNR administers an enforcement program, focused on numerical values to determine if cleanup is needed. The PECFA program is a reimbursement program with a more strict focus on the presence or absence of contamination. While Mews satisfied the DNR's clean-up standards, he did not meet the DOC's eligibility standard for two separate occurrences.

## Failure to Hold Interdepartmental Meeting

¶ 17. Mews also raises the issue of the interdepartmental meeting described in WIS. STAT. § 101.143(2m). This statute provides:

> INTERDEPARTMENTAL COORDINATION. Whenever the department of commerce receives a notification under sub. (3)(a)3 or the department of natural resources receives a notification of a petroleum product discharge . . . the department receiving the notification shall contact the other department and shall schedule a meeting of the owner or operator . . . and representatives of both departments.[2]

¶ 18. Mews argues that the statute is mandatory, requiring the departments to hold this meeting. Whether a statute is mandatory or directory is a matter of statutory construction and presents a question of law that we review without deference to the lower courts. *State v. Schertz*, 2002 WI App 289, ¶ 6, 258 Wis. 2d 351, 655 N.W.2d 175.

¶ 19. Generally, the word "shall" in a statute is presumed to be mandatory. *Hayen v. Hayen*, 2000 WI App 29, ¶ 18, 232 Wis. 2d 447, 606 N.W.2d 606. There are circumstances, however, where the term "shall" is directory rather than mandatory. *See Racine Family Court Comm'r v. M.E.*, 165 Wis. 2d 530, 535–36, 478 N.W.2d 21 (Ct. App. 1991). In deciding whether a

---

[2] WISCONSIN STAT. § 101.143(3)(a)3 provides in part that an owner or operator may submit a claim to the department of commerce for an award reimbursing that owner or operator for eligible costs incurred from petroleum products discharge if the owner or operator notifies the department before conducting a site investigation or remedial action.

statute's use of the word "shall" is mandatory or directory, we consider the objectives sought to be accomplished by the statute, the statute's history, the consequences that would flow from alternative interpretations, and whether a penalty is imposed by its violation. *Schertz*, 258 Wis. 2d 351, ¶ 7.

¶ 20. Mews argues that the purpose of the meeting would have been to clarify whether there were two sites or one for purposes of PECFA reimbursement. He argues that, had this meeting occurred, the DOC "could have made it clear to Mews that it considered there to be only 'one occurrence' at the site . . . [and] Mews could have made a reasonable decision about further site clean-up actions and the timing of those actions."

¶ 21. The DOC counters that the purpose of the meeting is not to explain the PECFA program to the site owner because the program is already explained in the statutes and administrative rules. It would be absurd, argues the DOC, to mandate a meeting for the purpose of providing information that is readily available in the statutes and rules.

¶ 22. The DOC asserts that the objective sought to be accomplished by the statute is made plain by the title of the section: Interdepartmental coordination. The DOC claims that this objective was realized through frequent interaction and communication between the DNR and DOC staff. Kochis's testimony supports this contention. At the administrative hearing, she testified that the DOC and the DNR communicate with each other on a "daily basis."

¶ 23. It would be unreasonable to hold that our legislature intended to mandate unnecessary meetings when agencies accomplish the objective of the statute

through other means of communication. If an interpretation of a statute leads to an unreasonable result, the statute should be considered directory rather than mandatory. *See M.E.*, 165 Wis. 2d at 535–36.

¶ 24. We are persuaded that the objective of the statute, in the absence of any legislative history to the contrary, is plainly indicated by its title, "Interdepartmental coordination." Because interdepartmental coordination occurs outside of meetings, the purpose of the statute is not compromised by our holding that it is directory rather than mandatory. The absence of a penalty for failure to hold the meeting is further evidence that the statute is directory in nature. Accordingly, we hold that the meeting described in Wis. Stat. § 101.143(2m) is intended to promote interagency coordination and is directory in nature rather than mandatory; however, the DOC is not absolved of its responsibility to hold the interdepartmental meeting with the site owner. A legislative directive is not to be ignored.[3]

*Equitable Estoppel*

¶ 25. Mews's final argument raises the doctrine of equitable estoppel. To establish equitable estoppel, Mews must demonstrate that the DOC's action or

---

[3] The record reveals a somewhat flippant attitude by the DOC regarding the interdepartmental meeting, particularly in light of the repeated efforts of Mews to initiate this meeting. We agree with Mews when he states that the DOC and DNR ignore such a legislative directive at their peril. Our decision should in no way be interpreted to mean that the interdepartmental coordination meeting with the site owner is not an important part of the PECFA process or otherwise a superfluous event.

nonaction induced reasonable reliance by Mews to his detriment. *See Kamps v. DOR*, 2003 WI App 106, ¶ 20, 264 Wis. 2d 794, 663 N.W.2d 306. "[W]hen estoppel is asserted against the government, the party invoking it bears a heavy burden: the evidence must be so clear and distinct that the contrary result would amount to a fraud." *Id.*

¶ 26. Mews refers to several undisputed facts to support his position. First, he points to the original PECFA claims for the removal of all three tanks. This created two separate excavation sites, which were separated by approximately forty feet and an intersecting road. Mews submitted two separate claims for PECFA reimbursement after the excavation and those claims were treated as two separate items. Mews also refers to a phone call on February 13, 1996, wherein Russ Haupt from PECFA indicated that two claims would be reviewed. These representations, argues Mews, establish the first element of equitable estoppel: that the DOC treated his clean-up sites as two separate occurrences. We agree with Mews that the DOC initially treated the excavation of the waste oil tank and the excavation of the two diesel tanks as two occurrences. We note, however, that the DOC's initial review and the final review of the remediation may not produce the same results. Under Wis. Stat. § 101.143(3)(h), the DOC may provide an initial review to estimate the owner's eligibility for an award. The final review of remedial actions is done "within 60 days *after* the claimant notifies the department that the remedial action activities *are completed.*" Sec. 101.143(3)(d) (emphasis added).

¶ 27. Next, Mews states that he relied on the DOC representations when he continued remediation activities on his property. The record includes correspondence from Mews seeking clarification on whether the

DOC would be reimbursing for one claim or two. Mews argues that all of the indications from the DOC, which were received only after much effort on Mews's part, led him to believe that he would be reimbursed for two occurrences. The DOC disputes that these continuing representations took place, pointing to the DNR's February 9, 1995 correspondence to Mews which advised Mews to "[n]ote that the contamination plumes may have intermingled, and this may effect [sic] the status of your PECFA deductible." Also, the DOC's partial denial of the second claim included an explanation of ineligibility which stated, "According to the information received at this office the contamination plumes have intermingled, therefore the claims were combined as one and a single $7,500.00 deductible was assessed."

¶ 28. Mews insists he relied upon representations that his remediation would reflect two reimbursable occurrences; however, the record demonstrates he disregarded several statements to the contrary. For purposes of claiming estoppel, a party's reliance must be reasonable. *Douglas County Child Support Enforcement Unit v. Fisher*, 185 Wis. 2d 662, 671, 517 N.W.2d 700 (Ct. App. 1994). We conclude that Mews's reliance on representations that he would be eligible for reimbursement on two PECFA occurrences was unreasonable in light of written comments provided by the DNR and the DOC as early as February 1995.

¶ 29. We need not reach Mews's contention that his reliance was to his detriment because his claim of equitable estoppel fails for lack of reasonable reliance.

## CONCLUSION

¶ 30. We recognize that Mews cooperated completely with all remediation efforts demanded by the

DNR. We also recognize that Mews made several attempts to ask for and receive clarification from the DNR and the DOC. The law, however, supports the DOC in this matter. The definition of a PECFA "occurrence" is published and unambiguous, and there is sufficient evidence in the record to support the DOC's application of the definition to Mews's claims. The conflicting standards used by the DNR and the DOC to determine "clean soil" arise from the distinct roles the agencies play in the remediation of contaminated sites. The failure to convene a meeting for purposes of interdepartmental coordination violated a legislative directive, but was not a fatal flaw in the process of reviewing Mews's claims for PECFA eligibility. Finally, we conclude that Mews's claim of equitable estoppel fails because his reliance was not reasonable in light of documented representations by the DNR and the DOC that the contaminated sites had intermingled and become one occurrence.

*By the Court.*—Order affirmed.